[Civ. No. 2632.    Third Appellate District.—August 8, 1923.]

P. W. BUSH, Appellant, v. WEED LUMBER COMPANY,
Respondent.

[1] INVITEES—LICENSE—USE OF PREMISES—INFERENCES.—An invitation to use the premises of another is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using them.

[2] ID.—DUTY OF INVITER TOWARD INVITEE—CARE.—Where a person is on the premises of another as an invitee, it is the duty of the owner to exercise ordinary care and prudence to render the premises reasonably safe for the invitee, and such duty has reference to such dangers as might reasonably be anticipated by a prudent and careful man.

[3] ID.—CONDITION OF PREMISES—DUTY OF OWNER.—The duty of the owner to an invitee to keep the premises in a reasonably safe condition need not necessarily apply to the entire premises but only to that portion thereof where the invitee would, under the circumstances and conditions of his invitation, naturally be likely to go.

[4] NEGLIGENCE—SEARCHER OF WATER—PERSONAL INJURIES—VERDICT—INFERENCES—APPEAL.—In an action for damages for personal injuries sustained by plaintiff when he was struck by a crane operated by a crew of men employed by defendant, whose operations he had stopped to watch after making a search for water at the invitation of defendant and while returning to his camp on the premises of defendant, the finding of the jury that defendant was not liable for such injuries will not be disturbed on appeal, where reasonable men might differ as to the inferences which might be drawn from all the pertinent evidence, and where it cannot be properly declared that no reasonable man could find in favor of the defendant.

APPEAL from a judgment of the Superior Court of Siskiyou County. George H. Cabaniss, Judge Presiding. Affirmed.

1.  Distinction between licensee and invitee, note, Ann. Cas. 1913C, 570.

2.  Duty of owner of premises to protect licensee or invitee against hidden dangers, notes, 17 L. R. A. (N. S.) 916; 9 B. R. C. 72.

3.  Duty of owner of premises to invitee temporarily following purpose of his own, note, 17 Ann. Cas. 591.

The facts are stated in the opinion of the court.

B. K. Collier and J. P. McNamara for Appellant.

Taylor & Tebbe for Respondent.

JONES, J., *pro tem.*—The plaintiff brought this action to recover damages for personal injuries alleged to have been caused by the negligence of defendant.

There have been two trials of the action, at the first of which the court granted defendant's motion for a nonsuit, but, upon an appeal, the judgment based thereon was reversed. (55 Cal. App. 588 [204 Pac. 24].)

At the second trial a jury returned a verdict for defendant, and from the judgment and order denying his motion for a new trial plaintiff has appealed.

In support of this appeal but one point is raised by appellant, namely, "that the evidence is insufficient to justify the verdict, or that the verdict is contrary to the evidence."

The nature of the action is set forth in the opinion of this court rendered on the former appeal, and a *résumé* of the evidence necessary to be considered on this appeal is as follows:

"Plaintiff testified: His vocation was that of well driller, and in June, 1919, had an agreement with the defendant to put in a well and was boarding at the Weed Camp; Camp No. 3 at Morrison. On a building of the defendant he noticed an advertisement offering any one who would find a spring that would furnish the camp with water, the sum of $100. He had a talk with Mr. Murphy, the general foreman of the defendant company, about the notice. He had to cease drilling until a certain lost part could be replaced and during this time he had the conversation with Mr. Murphy, in which he told him that one Phelps had said that he and Frank Mills had found a spring upon the side of Mount Shasta and that Phelps had described where they had found it. Murphy told him while he was laying off to go and hunt for it; to go to the barn, get a horse and go horseback. Told him that he couldn't ride horseback, that he would go out on the train as far as he could and come back on the train. Also told Murphy that a man by name of Hall had told him of water seeping out of Whaleback. He [meaning evidently Murphy] told him to go look for it, too.

On June 7th, he went out to hunt for water, walking that day. On June 9th, got on the train and went out to where they spotted the crane. They took the crane along with them that morning and spotted it and he got off the train and went up to Whaleback and hunted for three or four hours. Then he started back to the crane to take the train to go back to camp. The crane had not been moved while he was gone. The train was not there. He asked the crew if it had been up and he thinks they said it hadn't. Went over and sat down on a stump, the crane would kind of tip when they would pick up logs. Thought it might be dangerous to sit there so got up and went in back of crane about thirty or forty feet from it. Sat down on a log and took some rocks out of shoe. Was tired. Was going to wait for the train and rest. Finally got rested and thought he would walk to camp, when he looked up and saw crane was coming over backwards toward him. Had been resting about five or ten minutes. Point where he was would be a direct line from where he started back to go to the camp; it would be in between on a direct line. It was the most direct route from the place where he had been hunting back to camp. The crane was cabled but it didn't hold, the derrick fell straight back and hit him on the back. Crane weighed about twenty ton. Log being loaded at time of accident somewhere about two feet; less than a medium log; about sixteen feet long.

"On cross-examination he testified: Lived at Camp 3, one-half or three-fourths of a mile from the Merry Crane. Mr. Murphy told him to hunt for water at the base of Mt. Shasta, to hunt for the water that Hall had told him about, seeping out of Whaleback. There is a mountain they call Whaleback and he was hunting along the side of the mountain. Understood that he could go anywhere for water up above the place up there. Was hunting for water anywhere from 200 yards to a mile and a half from the Merry Crane. He came back to take the train where he got off. Didn't care to see the crane work, had seen it work hundreds of times. Didn't know it was a dangerous machine to be around. Came there to take the train and inquire of the crew if the train had been up. Was just beyond the crane and came right down to it in a direct route to the camp. There was no path, just woods and brush. Came from where he was

right straight down there, rocks and canyons there. A man would travel as straight as he could. There was no trail or wagon road or anything of that kind, a man naturally would hunt his °own course. Must have traveled four or five miles around Whaleback that day. Crane was where it was when he had gotten off train in the morning. Understood train would be up to get the loaded cars. Went mile and half or two miles above crane up the Whaleback. When he was sitting in front of crane, he saw it dip down. Got up and moved, believing it unsafe to stay where he was. Didn't know it wasn't working just right. Didn't know but what something might happen, so got up and went around in back. Didn't know there was any danger there. Hadn't been warned. Did not know place where he moved to be a dangerous one. Didn't think crane could possibly tip over backwards. Some of the men working could see him. They did not say anything. No signs of danger posted around.

"Lloyd W. Hoff testified: In June, 1919, was firing a locomotive for the Weed Company at Morrison Camp 3, know the Merry Crane that tipped over. Track where the crane was standing was built on said fill, very bad condition; not fit to put a locomotive on, ties were rotten. Was at crane ten or fifteen minutes after it tipped over; track had slid out. It wasn't in condition to hold anything up of that weight. Had not backed the crane in there that morning, it went in on its own power. Did not run locomotive out to where it got bad or to where the accident happened. Came two or three car-lengths from the place of the accident with the locomotive. Crane had not been anchored.

"M. Charles Hass testified: Mechanical Engineer. Had been employed by the Weed Company for three years. Had something to do with the repairing of their cranes. They used the Ohio Locomotive Crane designated as the Merry Crane. Approximate weight twenty tons. It is not safe to operate one of these cranes without anchoring it. Customary for the Weed Company to anchor them to the track with chains. Not a natural or common thing for them to turn over when properly operated. If properly handled, they are not dangerous to work. They have tipped over quite a number of times. Are used on temporary tracks where locomotives are not expected to go, where the grade is bad or

where it is hard to make a permanent track. Would say crane would not handle one ton on the side without tipping over unless chained. The liability of its tipping over if it wasn't chained would be increased if the ·track was poor. It would be dangerous and unsafe unless the crane was chained to operate it sideways in loading logs.

"Testimony of C. W. Murphy for defendant: In 1919 was superintendent of the logging. With the Weed Company since 1910. They have two of the Ohio cranes. Used to pick up logs in bad places. In loading logs they are not fastened to the track unless there is an extra heavy log. In 1919 railroad ran to Camp 6. Place where crane was was the tail of a switchback. Put tail around side of mountain to let crane go in to get a few logs. Trains ran through the other leg of the 'Y' possibly 1500 feet from where crane was working. Crane was not where train would go to get passengers or anything else. Crane worked upon a skeleton track, ties laid, every other tie spiked, not surfaced at all. Did not use passenger train or logging train out there. It was not a route for logging train. Whaleback extends eight or ten miles. No roads running from Whaleback to the crane and on to the camp. Brush and rocks; a little timber, rough country on hillside, no such thing as a direct route from Whaleback to the camp. No trail. A man going would simply have to wind around.

"Mr. Bush came to me and said that Mr. Phelps had told him where there was some water. We had a reward up for water and he said: 'I have got my tools lost in the well, I think I will go up and find it; I know where to go and find it.' I says, 'That is all right,' so he got a lunch together and went off to see if he can find it. . . . I says, 'Mr. Bush, there is an extra horse in the barn that you are welcome to use; you better go and get the horse and ride.' He told me about Phelps and somebody else. I don't remember who it was besides Phelps told him. He told me Phelps; I remember Phelps because I knew him and somebody else at the time told him he knew where there was a spring of water. I says, 'All right, the reward is there.' I didn't direct him to go anywheres. He thought he knew where he could find it. . . . I think I told him that he could go on the train if he couldn't ride a horse. . . . I didn't care where he went. . . . I don't remember any conversa-

tion on Whaleback. He told me he was going to hunt for water, he said he knew where there was some water. He didn't say anything about going in the vicinity of the Merry Crane, or anything. Only thing, it was just mentioned. I said, 'If you can find the water, there was the reward, go get it.' Never directed him which course or where to go. I didn't know where he wanted to go. . . . He said he was going to the foot of Mt. Shasta. Whaleback is a different ridge from Mt. Shasta. An opening between there and Mt. Shasta. . . . It is very dangerous for a man that isn't working on it to go around the crane. Most dangerous place is behind the crane when it is lifting. . . . We don't generally chain it or block it. An ordinary log would weigh a ton; some of them may be a ton and a half or two ton. There would be no necessity at all to lock the crane on to the rail to handle two tons with a fifty-ton plant. It would not do any good to chain it around the track. Skeleton track wouldn't hold it. It would take the track with it.

"In conversation with Mr. Bush, he didn't say anything about two different places. 'Q. You were willing to have him hunt anywhere in the vicinity that he wanted for this water? A. Just the same as anybody else.' He said he didn't want to ride a horse. I think I told him 'all right go any way you like, on the train, go any way you like; didn't make any difference to me.' I know of crane tipping over twice in one day. It tipped over a good many times; we expect them to tip over. I suppose you could anchor crane to trees on either side. I don't think it would be practicable. You could anchor it from pulling sideways. I don't know as that would do you any good when you come to tip over.

"Crane weighed fifty tons when filled with scrap iron. I think this crane was filled, practically so, couldn't say that it was filled altogether."

"Lloyd W. Hoff (in rebuttal) : Crane was sitting beyond switch. Hauled the crane crew out there . . . stopped at the switch and let the crane crew off. That morning was just enough beyond the switch to get the cars in the clear, so they could throw the switch and go on up in the woods, was possibly two or three car-lengths from the crane. Crane was then sitting where the accident occurred. 'Q. You mean you ran up on the switch to deliver the men working on the

Merry Crane? A. We stopped at the switch for them to get off. Q. How far is the switch from the place where the accident occurred. A. I don't remember, about twelve or fourteen car-lengths.' ''

That appellant was on the premises of respondent as an invitee and not as a licensee is evident from the testimony of the witness Murphy, which shows that the former was engaged in searching for water, following a conversation with the latter in which appellant was encouraged to make the search and was invited to use the train of respondent in going to and returning from the place of his search. [1] An invitation to use the premises of another is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using them. (*Bennett* v. *Louisville & N. R. Co.*, 102 U. S. 577 [6 L. Ed. 235, sec, also, Rose's U. S. Notes].)

[2] The status, then, of appellant being that of an invitee, it became the duty of respondent to exercise ordinary care and prudence to render the premises reasonably safe for the appellant (Cooley on Torts, 2d ed., p. 718; *Clark* v. *Northern Pac. R. Co.*, 29 Wash. 139 [59 L. R. A. 508, 69 Pac. 636]; *True* v. *Meredith Creamery*, 72 N. H. 154 [55 Atl. 893]), and that duty has reference to such dangers as might reasonably be anticipated by a prudent and careful man. (*Hart* v. *Grennell*, 122 N. Y. 371 [25 N. E. 354].) In *Stone* v. *Boston & A. R. Co.*, 171 Mass. 536 [41 L. R. A. 794, 51 N. E. 1], it is said: ''One is bound to anticipate and provide against what usually happens and what is likely to happen, but it would impose too heavy a responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen, or what is only remotely and slightly probable. A high degree of caution might and perhaps would guard against injurious consequences which are merely possible; but it is not negligence in a legal sense to omit to do so''; and in the case of *Mayne* v. *Chicago etc. Ry. Co.*, 12 Okl. 10 [69 Pac. 933], we find language of similar import: ''What is usual, the law requires a person doing a wrong to anticipate and provide against, but the law does not require that even a wrong-doer shall anticipate and provide against the unusual.''

[3] The duty of the owner to an invitee to keep the premises in a reasonably safe condition need not necessarily apply to the entire premises but only to that portion thereof where the invitee would, under the circumstances and conditions of his invitation, naturally be likely to go.

"The degree of care required to be taken when one invites another to enter his premises is reasonable care. It may be qualified by the circumstances of the invitation, which include the character of the place . . . which the visitor is invited to use, the nature of the use which he is invited to make of it, and the conditions and circumstances under which such use is invited to be made." (*South Australian Co.* v. *Richardson* [Australia], 20 C. L. R. 181, 9 B. R. C. 52.)

"Negligence consists in the violation of some duty, having regard to the relation between the parties, to time, place and circumstances. . . . This duty is relative not absolute." (*Dowd* v. *Chicago etc. Co.*, 84 Wis. 105 [36 Am. St. Rep. 917, 20 L. R. A. 527, 54 N. W. 24]), and the rule is that negligence is a question of fact for the jury, even when there is no conflict of the evidence, if different conclusions can be rationally drawn from the evidence. (*Wahlgren* v. *Market St. Ry. Co.*, 132 Cal. 656 [62 Pac. 308, 64 Pac. 993].)

In order to sustain the contention of appellant it must be held that the conclusion of the jury cannot be supported on any hypothesis whatever; that the character of the evidence was such that only a verdict finding respondent liable was proper. We are not persuaded that such a condition exists in this case, for it cannot be said, as a matter of law, that the appellant at the time he received the injuries complained of was in a part of the premises covered by his invitation; nor can it be said, as a matter of law, that the appellant, if an invitee, was in a part of the premises where he would naturally and ordinarily be likely to go in view of the character and circumstances of his invitation, nor can it be said, as a matter of law, that the respondent should have reasonably expected, in view of the character of the invitation given to appellant to search for water and to take the train in pursuing his search, that the appellant would likely go to the vicinity of the crane and in close proximity to it. It would be for the jury to say whether the operation of the crane in the manner admitted by the witness Murphy, at a

point fifteen hundred feet from the main line of the company's railroad and not in the vicinity of any road or path, constituted a failure on the part of respondent to exercise reasonable care in respect to the appellant.

[4] Considering all the pertinent evidence in the case, it is apparent that reasonable men might differ as to the inferences which might be drawn therefrom, and it cannot be properly. declared that no reasonable man could find in favor of the defendant. "If the finding of fact is based upon a reasonable inference, it is not within the power of this court to set it aside." (*Ryder* v. *Bamberger*, 172. Cal. 791, 799 [158 Pac. 753, 756].)

The judgment and order appealed from are therefore affirmed.

Burnett, J., and Finch, P. J., concurred.