LITTLE RIVER RAILWAY COMPANY v. BOYD D. DOTSON.

Eastern Section. February 15, 1930.

Petition for Certiorari denied by Supreme Court, May 30, 1930.

Gamble, Crawford & Goddard and Dunn & Jackson, of Maryville, and James B. Wright, of Knoxville, for plaintiff in error.

Kramer & Kramer, of Maryville, for defendant in error.

PORTRUM, J. This suit was instituted by Boyd D. Dotson, administrator of Joe McCauley, deceased against the Little River Railway Company, for damages in the sum of $25,000, as a result of the death of the plaintiff's intestate caused by the trucks of a car of the company leaving the track and pinning him to a building, mashing him, and injuring him to such an extent that he died.

The Little River Railway Co., operates a railroad from Townsend, Tennessee, to Walland, Tennessee, and there connects with the Southern Railway. A switch track leads to a line of the Southern Railway north of the depot at Walland and runs across the river into the lands or premises of the England Walton & Co., who owns and operates the Schlosser Tannery. This is a private siding owned by the tannery and is used for its convenience as well as the convenience of other shippers who are permitted to receive freight along this private siding by the tannery company as well as the railway. The Little River Railway Co., was authorized and granted the privilege by the England Walton Co., to use this spur track from the main line of the Southern for the delivery and receipt of freight to the England Walton Co., and others.

At the time of the accident, the Highway Department of the State of Tennessee was constructing a road from Maryville to Townsend and it was necessary to build a bridge across the creek near the spur track. The Highway Department had some timbers at Loudon, Tennessee, and wanted to remove these timbers to the location of this bridge and made an arrangement with the Little River Lumber Co., owner of the Little River Railway Co., to take the timber and cut it into bridge sizes and haul it without compensation to the location where it was to be used, the department agreeing to remove the timber from the car and transport it to the place where it was to be placed in the bridge. The car loaded with timber was picked up at Townsend and hauled to Walland and there shoved across the private tracks of the tannery company and across the highway, which crossed the track, to the place designated by the bridge foreman, who was on the ground and had his crew there to assist in unloading the timbers. In making this switch operation it was necessary for the engineer to push the flat car before it over this track. There were three cars setting on the side track on the tannery company premises. It was necessary to couple up to these cars and push them ahead in order to place the flat car at the place designated. The car loaded with timber was stopped at a convenient place selected by the department and at the time certain employees of the highway department were present and ready to unload the timber. Three of these men got upon the car and began to throw off the timbers. The conductor of the train and his flagman were on the flat car and assisting in unloading the timber.

After the timbers were unloaded, Swan, the conductor, noticed certain of the timber which had fallen down and was in the way of the train when moving; and he said to the highway employees that the timber would have to be moved and one piece was moved. There was either another piece laying on the end of the ties, or the piece was not removed clear of the track. After this timber was moved Swan asked the foreman of the bridge crew, ''What do you say?'' And he called

out, "All right." The conductor then gave the signal to the fireman on the engine to back the engine and train away. Swan then stepped off the car onto the timber and walked to the end of the timbers, watching the moving cars and observing the clearance of the wheels or boxing and timber remaining upon the end of the ties, to see if they were clearing and to see that nothing touched. When the third car came along he grabbed to the end of this car, which was next to the last car coupled to the train. He got on this car in order to be able to stop these cars back at the place where they were found. As the last of these cars came along the boxing of the rear wheels caught the end of this heavy timber and pushed it along upon the ties with the moving train. The two front box cars that passed over this timber barely rubbing the boxing against the timber and even the front boxing on the last car had only scraped it, but the jarring of the train or the scraping of the timber by the passing boxing changed its position and caused the rear boxing to engage it in the manner indicated. This car was a Pennsylvania box car and its boxing was somewhat lower than the boxing on the ordinary box car.

As the train moved away and after the Pennsylvania car had travelled a hundred or more feet carrying this timber sliding along the ties, it came to the road crossing where the ground was built up level with the rails, which formed an obstruction to the timber in its course upon the ties, and the timber catching in the dirt and gravel served as a scotch or brake upon the car, with such force as to obstruct its motion and cause the trucks to leave the track and the car to pitch to the north side of the railway or the roadbed at this point. Immediately below the public road, the siding ran between two buildings of the tannery company, the clearance being only fifteen feet between the two buildings; and between this track and the building the deceased was walking in the same direction as the moving train, occupying a space of not more than three feet between the train and the building, and on the same side as the derailed car. The train moved on and the truck of the Pennsylvania car was dragged over the ties and ground throwing the body of the car against the building, and when the car overtook the deceased he was caught between the building and the car and crushed.

The deceased was an employee of the England Walton Co., and his duties were to keep the grounds of the company in order by cutting and removing the grass and like duties. The employees of the company quit work at 4:30 in the afternoon, but at 4:20 the first whistle blew in order that they make preparation to leave the grounds at 4:30. They were not permitted to leave the grounds earlier than 4:30 and it was their duty to remain upon the grounds after the first whistle and until the second if for any reason they were ready to go sooner. The accident occurred between the blowing of the first

and second whistle at the time the deceased had put his tools away and was following the pathway between this building and the railroad track for an unascertained purpose. However, he was upon the premises of the employer and may or may not have been in the act of performing a service for the employer. There is no evidence that he saw the approaching train nor that the employees of the railway saw him further than an inference that since the fireman who occupied a position on his side of the track and could have seen the deceased but he was not called to testify by his employer. It is shown that the employees of the tannery use this pathway while moving about on the premises when the tracks are free and also when they are occupied by trains or cars. This building on the side where the deceased was killed had a door about midway of the building facing the track, which was used to remove freight from the open cars placed upon the siding.

Upon this state of facts the plaintiff seeks to recover damages for the death of the deceased. The grounds of negligence are that the railway negligently unloaded the car and permitted the falling timbers to remain in such position as to catch in the wheels of the car and cause the injury, and then with this condition existing, in ordering the train to move along the siding; and in failing to stop the train after the piece of timber had come in contact with the track and the car before the car was derailed; and in operating the train after the car was derailed. A further ground of negligence is, the train crew failed to exercise proper care and caution to protect the deceased from injury after his dangerous situation was observed or by the exercise of ordinary care should have been observed and in failing to stop the train after the dangerous situation became apparent or to take steps preliminary to stopping it before the injury.

To the declaration the defendant filed a motion to strike the first count because it does not specify any ground of negligence upon which plaintiff's right of action is predicated but merely states a conclusion of law. And to strike the second count on the ground of duplicity because it embodied four separate and distinct grounds of negligence, and also to strike the third count because of duplicity for alleging three distinct grounds of negligence. This motion was overruled and defendant entered a plea of not guilty to all the counts of the declaration. The case went to trial before the judge and a jury and a verdict and judgment was had for fifty-five hundred dollars ($5500); a motion for a new trial was made and overruled and appeal prosecuted to this court.

At the conclusion of all the evidence the defendant moved the court to direct a verdict in its favor and the court's action in declining this motion is assigned as error. The determination of this assignment decides the great majority of the assignments of error, because they

are based upon the underlying question raised by this assignment. There is no discussion of the evidence with reference to negligence with a view of establishing the fact that there is no evidence to support the verdict. The insistence is that the evidence establishes a condition for which the railway company is not responsible. In other words, from the evidence a legal question arises which if determined in one way exculpates the defendant, and it is insisted that the court should determine this legal question in this way. The question is, What was the status of the deceased? It is insisted by the defendant that he was a trespasser upon the tracks of the company or a licensée, since he was not a passenger. The plaintiff insists that he was neither a trespasser nor a licensée. The plaintiff failed to define the legal status of the deceased in his declaration and the court gave no definition of the status, the defendant insisting at the outset that the plaintiff be required to make a definition in the declaration and later that the court define his status to the jury. And the absence of this definition is the main contention on this appeal. Taking up first the right of defendant to insist upon striking the declaration in the absence of a definition defining the status and duties of the railroad company towards this deceased.

This question cannot be raised under a motion for a directed verdict. Pleadings are tested either by motion to quash (and a motion to strike is in the nature of a motion to quash) or by a motion in arrest of judgment. Either of these motions raises a question of law, while a motion for a directed verdict raises a question of fact, or a mixed question of law and fact. Therefore the sufficiency of the declaration cannot be tested by a motion for peremptory instructions, especially after a motion to strike has been made and acted upon by the court. The motion to strike in this case was made at a former term and overruled and there was no motion for a new trial made at that time to preserve the question so it became final and is not open now to review (as has been recently held by the Supreme Court). See also, Harriman & N. E. Ry. Co. v. James, 1 Tenn. App., 207. The case of White v. R. R., 108 Tenn., 741, is therefore not in point.

It is insisted that the deceased was either a trespasser or a licensee and that the railway company owed him no duty except not to wantonly or intentionally injure him; and that there is no proof in the record tending to establish the fact the company wantonly or intentionally did him any injury, therefore there is no evidence to support the verdict. The definition of the status will simplify this inquiry. At the time of the injury he was about his master's duty, upon his master's premises. At least he was not permitted to leave the premises until 4:30—a time later than the accident, and in the performance of his duties he was not restricted to any portion of the premises, and his duty called him over the premises; and at the place of the accident

he was using a pathway that was in use by the employees of the company even at times when it was occupied by trains or place cars. It necessarily follows that he was in a place of comparative safety. It was not shown that he was conscious of the approaching train nor of the impending danger and a definition of his status will reflect the duties, if any, that the railway company owed him. His status can best be determined indirectly by showing what he was not rather than undertaking to say what he was, or by defining the status of the railway company while occupying the private tracks of the deceased's employer. It is shown the tracks were used for the mutual benefit of the company and the owner and the railroad also used the tracks for its benefit in delivering freight to third parties as was the case in this instance. Since it did not own the tracks it necessarily was upon the premises as an invitee, licensee or trespasser. It was not there as a trespasser because it had a right to be there. The distinction between a licensee and an invitee is defined as follows:

An invitation to use the premises of another is inferred, where there is a common interest or mutual advantage, while a licensee is inferred where the object is the mere pleasure or benefit of the persons using it. B. S. H. v. Weed Lumber Co., 63 Cal. A., 426, 218 P., 618.

Invitation by owner or occupant of premises is implied where one goes on the premises for benefit, real or supposed, of the owner or occupant, on a matter of mutual interest or in usual course of business, or performance of some duty. Petree v. Davidson-Paxon Stokes Co., 30 Ga. A., 490, 118 S. E., 697; 36 C. J., 616.

It necessarily follows from these definitions that the railway company was itself either an invitee or a licensee.

The controlling distinction of a license is the power of a licensor to revoke. The deceased was not a trespasser nor a licensee for the railway company had no right to order him off of these premises and deny him a right to use this pathway nor the right to revoke any license granted him. He had the same right to the use of the property as his employer or the owner so long as he remained in the employment of the company and performed his duties assigned him. The railway company in exercising its rights to use this private siding was under the duty to use ordinary care at least to protect the owner or its employees against its negligent acts.

We conclude, therefore, that the railway company owed the deceased the duty to exercise at least ordinary care to prevent his injury from its negligence, and since the injury arose out of the negligence of the company a case of liability was made out.

The plaintiff in error has assigned error to the action of the Circuit Judge in refusing special requests and also in charging the jury in respect to the duty the railway company owed the deceased. To take up these assignments would necessarily require a repetition of

the statements made under the foregoing assignment, and they are overruled for the reasons above stated, leaving for treatment only such assignments as do not raise this question.

It is seriously insisted that the Circuit Judge committed error in reading the whole of the declaration to the jury in his charge and thereafter making a statement of the theories and contentions of the parties. We are not convinced that the jury was misled by an over-emphasis of the plaintiff's theory, at least we are of the opinion that there was no affirmative showing of error. This may not be the best practice, but it is one that is often followed and the court would establish a radical change in the practice by condemning it and requiring a new trial. Complaint is made to the manner of the court in charging the jury by stating the contention of the plaintiff and then saying if the jury believes this to be true then the act of the railway company was negligent. It is said that this is equivalent to the determination of the question of fact by the court, i. e., What is negligence? It is true that the question of what is negligence is a question of fact, but when the facts are not disputed, then it becomes a question of law, and if the hypothesis as stated by the court is found by the jury then we see no objection to the court stating to them that the railway was guilty of negligence. The effect of this is for the court to pass upon undisputed facts and it is not an invasion of the province of the jury.

Under another assignment, the plaintiff in error takes the contrary position and says that the court should have found from the facts the deceased was guilty of contributory negligence. Had the facts justified such a finding of the court, he should have directed the jury accordingly. But in this case the facts while to an extent undisputed are not such that reasonable men would not draw different inferences. In other words reasonable men might think that the deceased acted in a prudent way or that he did no act that directly or proximately contributed to his injury. He did not know the train was present until it was passing him and finding himself in this position there was nothing he could have done to extricate himself and avoid the danger.

We think we have treated all material and disconnected assignments of error. However, we have given due consideration to all of them and find that the court may have in some disconnected sentences failed to make a full statement, in other portions of the charge he had directed the jury fully, and these slips of memory cannot be charged as affirmative error effecting the result.

The assignments of error are overruled and the judgment of the lower court is affirmed at the cost of plaintiff in error and the sureties on his appeal bond.

Snodgrass and Thompson, JJ., concur.