[Civ. No. 10101.   Second Appellate District, Division One.—December 11, 1935.]

LAWRENCE PAPINEAU, Respondent, v. DISTRIBUTORS PACKING COMPANY (a Corporation), Appellant.

A. G. Allen, Jennings & Belcher and Louis E. Kearney for Appellant.

J. M. Clements for Respondent.

ROTH, J., *pro tem.*—Respondent Papineau was an employee of the Pacific Tank & Pipe Company, which had contracted to erect a cooling plant on the roof of one of the buildings located on the premises of appellant Distributors Packing Company. North of the building in question, and almost adjoining it, was a water tower which consisted of four upright posts held in juxtaposition by two sets of crossbars or girders completely encircling the uprights and appropriately spaced between the bottom and top of the uprights. At the top of the uprights was constructed an octagonal platform with a railing; resting on this platform was a water tank. The southwest upright had a series of wooden cleats running from the ground up to the water tank platform, which were nailed on and extended beyond each side of the upright. These were attached to the south face of the southwest upright on the side closest to the building, upon the roof of which the cooling plant was to be constructed, and formed a continuous ladder from the ground to the platform upon which the water tank rested. The northwest upright had a series of wooden cleats also of the same nature on the west face of the northwest upright, distributed all the way up, but not from the ground, as will hereinafter be made more clear, and not at the same regularly spaced intervals as were the cleats on the southwest upright. The accident, which resulted in the injuries for which damages were obtained in the instant action, occurred in the use of this northwest upright as a ladder. If differed from the ladder described on the face of the southwest upright in that there was on the north side of the water tank tower and adjacent to it, and particularly contiguous to the northwest and northeast uprights, at the bottom, a low shed with a roof just below the first crossbar or girder which embraced the four uprights. At the base of the water tower and to the west of it there was a pigpen. Because of this shed and the pigpen, the wooden cleat on the northwest upright closest to the ground was 9 feet 8 inches above it. From this cleat to the next above was a

distance of 4 feet 9 inches; then followed six cleats spaced at approximately regular intervals and from the topmost of these six to the next above was approximately 6 feet 8 inches. Between the second crossbar or girder above the ground and the platform built, as aforesaid, at the top of the uprights were four cleats, the topmost of which was 6 feet 4 inches below the bottom of said platform. The entire structure was of wood.

On April 28, 1932, one Huston, appellant's superintendent, in respondent's presence requested a guy wire to be placed on the northwest upright of the water tank tower just above the lowest crossbar or girder. In order to get the end of this guy line fastened there, respondent started to climb the ladder on the northwest upright of the water tank tower. One of the cleats between the two crossbars or girders, specifically the fourth cleat in the series of six first mentioned, split in two when he grasped it with his left hand, whereupon he fell first to the roof of the little shed and then on to the ground, suffering injuries which will be mentioned more in detail hereinafter. The fourth cleat in question cracked on the grain of the wood, which was not straight, and part fell to the ground, and part remained on the upright. The nails which had held the cleat were almost rusted through. Respondent sued appellant on the theory of negligence, obtained a judgment for $30,250, which, on motion for new trial on consent of respondent, was reduced to $20,000, in which latter amount judgment was finally entered. From that judgment appellant takes this appeal.

Appellant contends in its brief that its "sole duty was to warn plaintiff of latent defects upon that portion of the premises where it was reasonably contemplated he might go— and that duty obtained only in case the latent defect was known or in the exercise of ordinary care should have been known, to defendant". (*Hall* v. *Southern California Edison Co., Ltd.*, 137 Cal. App. 449 [30 Pac. (2d) 1013]; *Baddeley* v. *Shea*, 114 Cal. 1 [45 Pac. 990, 55 Am. St. Rep. 56, 33 L. R. A. 747]; *Thompson* v. *California Construction Co.*, 148 Cal. 35 [82 Pac. 367].) This contention seems to be upheld by the authorities cited, and we accept it as the law. In order to determine the question of appellant's negligence, therefore, it becomes necessary to decide whether appellant as a reasonable person was chargeable with notice that respondent would use said upright as a ladder, and whether appellant

knew of the defect or, in the exercise of ordinary care, was chargeable with knowledge of circumstances which placed appellant on notice as to the condition of the northwest upright and its safety for use as a ladder. The evidence shows that Huston had been superintendent of appellant corporation for five years; that he had general charge of the maintenance of appellant's premises, looked after general repairs and had a crew of repair men and engineers working under his supervision, assisting him in properly maintaining the plant and keeping it in repair. He admitted that he inspected the premises for run-down conditions every day, but asserted that he never inspected the northwest upright of the water tank. He also asserted that the employees of the defendant corporation never used the cleats on the northwest upright of the water tower to ascend the tower. There is no evidence, however, that they were never used for any purpose, nor is there any evidence that he or anyone on appellant's behalf or anyone for appellant ever advised respondent or any of respondent's superiors that the northwest upright was never used as a ladder, or that it had never been inspected. Whether Huston directed Papineau to use either or both ladders on the southwest and northwest uprights can be ascertained only by inference from the evidence. The day prior to the commencement of work, respondent went to appellant's premises and inquired of Huston, the superintendent, how the roof of the building on which the cooling plant was to be installed could be reached. The following conversation then took place:

"Q. You came over there the day before you commenced work on the tower? A. Yes. Q. And looked at the water tank tower at that time? A. I just looked at it, yes, sir. Q. Where were you at the time you looked at it? A. I came down and inquired for Mr. Huston how I could get up there on the roof and he brought me down to the alleyway, which is to the north of the picture here, and we stopped outside the gate, and he pointed to the tower and said, 'That is where you get up on the roof.' Q. In other words, you looked at that tower at that time and saw there on the ground just about the same view that we get here when we look at the picture? A. Yes, sir, just about the same view. Q. When you looked at this water tank tower, you observed a ladder running up the side of the building? A. Yes. Q. And you observed that this tower had four corner posts?

A. Yes, sir. Q. And you observed some cleats on the north-west post? A. I remember seeing the cleats there. Q. And you saw that it was something over nine feet from the ground to the first cleat on the northwest post? A. I did not pay any special attention to that at that time. Q. You did observe gaps in between some of the cleats on the northwest corner? A. I did not pay any special attention to that at that time. Q. Didn't you observe at that time that there was not a complete ladder on the northwest post? A. No, I didn't pay any attention to it at that time. Q. You did, however, observe that this was a complete ladder on the southwest post? A. Yes. Q. But you paid no particular attention to the northwest post? A. No, no more than to look at it in a general way. Q. You did not at that time contemplate using the northwest upright at all, did you? A. No.''

The evidence shows in addition that on the day when the accident occurred, Huston directed the attachment of a guy wire to the northwest upright. A portion of the evidence in that respect is as follows: '' . . . Repeat what you said. A. Mr. Huston said he wanted another guy line placed on the north side, on account of the north winds, and Mr. Obert said, 'Well, we have four guy lines on there now.' And Mr. Huston said, 'Yes, but you don't know how hard we get these north winds up here.' And Mr. Obert said, 'I can show you numbers of jobs where we have no guy lines at all, merely attached to the foundation.' And Mr. Huston turned around and pointed to the north, and then pointed a little bit to the northwest, correcting himself, and he says, 'We get some terribly hard north winds, right out from that open space, and there should be another guy line placed on the north side.' Mr. Obert said, 'Well, all right, I will furnish you with another guy line.' The next question was, where should we place it, and Mr. Huston pointing to the tank tower there says, 'On the northwest post, just above that little "gird".' ''

The witness Obert further testified as follows: ''Q. Just state all that he said, and what you said and what Mr. Papineau said. A. I told Mr. Huston that the tower was designed to stand without guy wires, and that we figured that we had plenty of guy wires on it, but if he wanted an additional wire, that was up to him, and we would be glad to do it. Q. What further was said? A. He said he would like to have one more guy wire placed on the north side. I asked him

where he had better tie it, and he said, 'You better tie it to the tank tower on the north side of the tank tower.' Q. Was there any further conversation? A. Yes, I told him we did not have the wire there, but we would send one over later in the day and have it put on."

In *Bush* v. *Weed Lumber Co.*, 63 Cal. App. 426, 432 [218 Pac. 618], it is said: "An invitation to use the premises of another is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using them." Appellant does not dispute that Papineau was legally on its premises, and the evidence clearly demonstrates that he was an invitee. In view of the nature of the work to be done and in the light of the brief excerpts of testimony set forth, it is also clear to us that appellant invited Papineau not only on its premises, but also to the use of the entire water tower in connection with the job to be done. In the Bush case, *supra*, it is further said at page 432: "The status, then, of appellant being that of an invitee, it became the duty of respondent to exercise ordinary care and prudence to render the premises reasonably safe for the appellant, . . . and that duty has reference to such dangers as might reasonably be anticipated by a prudent and careful man." Applying his language to the circumstances surrounding the attachment of the guy wires to the northwest upright, and keeping in mind that there was constructed on said upright a partial ladder which in conjunction with the roof of the shed immediately contiguous to the northwest upright, furnished ready access to that portion of the water tower between the two crossbars or girders, it seems clear to us that the jury or the trial court would be justified in finding that the use of said northwest upright as a ladder "might reasonably be anticipated by a prudent and careful man". In the Bush case, *supra*, the court concludes its opinion by saying at page 434:

"Considering all the pertinent evidence in the case, it is apparent that reasonable men might differ as to the inferences which might be drawn therefrom, and it cannot be properly declared that no reasonable man could find in favor of the defendant. 'If the finding of fact is based upon a reasonable inference, it is not within the power of this court to set it aside.' . . . "

■ So, on the facts of this case, it cannot be said that the jury was not justified in finding that the appellant was negligent in the maintenance of its premises. Appellant, if it had extended the inspection of its premises, which the evidence shows was habitually made through its superintendent Huston, to the partial ladder on the northwest upright, could easily have ascertained the condition of the same. The jury was justified in believing from the evidence that appellant had invited respondent to use this very upright. Under such circumstances the jury was justified in concluding that appellant in effect advised respondent that it was safe to use, and that appellant, therefore, assumed the responsibility for its safety. (*Harvey* v. *Machtig,* 73 Cal. App. 667 [239 Pac. 78]; *Cordler* v. *Keffel,* 161 Cal. 475 [119 Pac. 658].) In the case of *Harvey* v. *Machtig, supra,* at page 674, the court says: "To use and keep in operation a device or apparatus upon which the safety of human life depends, without it being frequently or properly tested as to its continued strength and efficiency to meet the purposes for which used, is not such reasonable care as a prudent man should take to guard the safety of those intrusted to his protection. . . ." Since the very nature of the upright, equipped as it was for ladder purposes, advertised itself as being fitted for that use, there was under the circumstances of this case a duty upon appellant to keep it fit or to ascertain its fitness for that use.

■ We find nothing in the record that compels the conclusion that Papineau was guilty of contributory negligence as a matter of law. The jury, as we have pointed out, was justified in finding from the evidence that Huston had directed the attachment of the guy wire to the northwest upright, and had in effect notified Papineau to use the incomplete ladder on the northwest upright to effect that purpose. The record shows nothing from which it can be said that Papineau was put on notice that the incomplete ladder was never used, or that it was defective. There is no evidence, physical or otherwise, that the ladder on the northwest upright was at any time different than the same incomplete ladder that Papineau first saw, or that as such it was not fully completed as a means of upward approach from the roof of the shed to that portion of the space between the cross-bars or girders. When more than one rational conclusion can be drawn from the evidence by reasonable men, the question of contributory negligence is

one of fact and not of law. (*Hall* v. *Barber Door Co.*, 218 Cal. 412 [23 Pac. (2d) 279]; *Meindersee* v. *Meyers*, 188 Cal. 498 [205 Pac. 1078]; *Oliver* v. *Stoltenberg*, 24 Cal. App. 637 [142 Pac. 108].)

Speaking of this principle, the court says in the Stoltenberg case at page 639: " 'Appellant's proposition is that the facts being undisputed, it was a question of law as to whether or not the defendants were negligent, and that the finding and determination of the court is against the law and against the evidence. This however, may not be said. It was for the court, as it would have been for the jury, considering all of the circumstances and facts shown by the evidence, to declare whether the defendants were or were not negligent. . . . The defendants were called upon to exercise the care which the circumstances required in the construction or maintenance of the temporary driveway, and what was ordinary care it was peculiarly the province of the court below, sitting as a trier of facts, to determine.' "

Appellant's next point is that the verdict and judgment entered thereon was excessive by reason of passion and prejudice and that the judgment should therefore be reversed.

Respondent, according to the record, suffered injuries as follows: paralysis of and inability to raise the left arm; paralysis of the left side of the face, causing inability to use muscles on the left and right sides of the face, which resulted in talking with a lisp; a scar seven inches long from the front to the back on the right side of the scalp; shrinkage of the muscles and tissues of the left leg; impairment of hearing and vision; pain and sensitiveness of the left shoulder joint, and many other related pains and impairments too numerous to mention.

The evidence shows that by reason of the fall, respondent suffered a broken neck, and that the fifth, sixth and seventh cervical vertebrae bodies were broken; that he had a halter around his neck and jaw to keep his head immovable, and that he was kept in bed under sedatives and opiates for a period of ten days; that the halter was used for one month, and that he had remained in the hospital for a period of three months, and had been treated up until the time of the trial; that he was in good physical condition before the accident, had worked regularly every day, and his injuries are such that he will never be able to resume his occupation of structural foreman.

We are of the opinion that the verdict was not excessive, and the mere fact that the verdict was reduced by the trial court is no evidence whatever of passion and prejudice. (*Swett* v. *Gray*, 141 Cal. 63 [74 Pac. 439].)

Complaint is made that the court erred in giving five several instructions requested by respondent and in refusing to give three several instructions requested by appellant. We have perused these instructions and, reading the charge as a whole, we find no prejudicial error, and are of the opinion that the instructions given to the jury were fair and complete. The language of the court in *Sellers* v. *Wood etc. Co.*, 205 Cal. 519, at 524 [271 Pac. 1055], is appropriate on this point: ''Extended argument is made that error occurred in the giving of certain instructions. The instructions as a whole correctly and fairly stated the law to the jury and the merits of this action are so apparent that technical errors in instructions would not warrant a reversal of the judgment.''

The judgment is affirmed.

Houser, P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 31, 1935, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 6, 1936. Thompson, J., voted for a hearing.