[Civ. No. 25139. Second Dist., Div. One. July 26, 1962.]

JOHN P. ULWELLING et al., Plaintiffs and Appellants, v. CROWN COACH CORPORATION et al., Defendants and Respondents.

[Civ. No. 25609. Second Dist., Div. One. July 26, 1962.]

ANGELINA J. SMITH et al., Plaintiffs and Appellants, v. INTERNATIONAL HARVESTER COMPANY et al., Defendants and Respondents.

(Consolidated Cases.)

98

Harney, Drummond & Dorsey and John K. Ford for Plaintiffs and Appellants in No. 25139.

Hirson & Horn for Plaintiffs and Appellants in No. 25609.

Betts, Ely & Loomis, Richard F. Runkle, Roger Arnebergh, City Attorney (Los Angeles), Bourke Jones, Assistant City Attorney, Davis H. Von Wittenburgh, Deputy City Attorney, Gilbert, Thompson & Kelly, Jean Wunderlich, Spray, Gould & Bowers, Joseph L. Spray, Moss, Lyon & Dunn, Fulton W. Haight, Henry F. Walker, Early, Maslach, Foran & Williams, Victor E. Williams and Donald J. Pierr for Defendants and Respondents.

LILLIE, J.—On September 30, 1957, a number of school children were riding in a bus owned by Foster Transportation,

Inc., and operated by Melden Smith, at approximately 3 p. m., as it approached the crest of a hill, the drive shaft separated and damaged the air line operating the air brake system; unable to stop or slow down and gaining speed and momentum, the bus crashed into a pedestrian foot bridge and plunged 35 feet into a ravine. The driver and several minors were killed; the others were injured; they, themselves, or through their heirs at law, were plaintiffs in 16 separate actions consolidated for trial. Defendants included Crown Coach Corp., International Harvester Co., Truck Brake Service Co., Inc., Truck Insurance Exchange, Truck Underwriters Association, City of Los Angeles and Foster Transportation, Inc. Also consolidated for trial and on appeal is the wrongful death action of *Smith* v. *Foster* brought by the heirs of the driver; in addition to the above defendants (except the city and Foster Transportation, Inc.) they sued Norman, Charles and Bernice Foster. Judgments of nonsuit were entered in favor of Crown, International and the individual Fosters; judgments on jury verdicts were entered against Foster Transportation, Inc., and in favor of the remaining defendants. All plaintiffs have appealed; all defendants except Foster Transportation, Inc., and Bernice Foster are respondents.

## JUDGMENTS OF NONSUIT

Because of the number of parties and the variety of legal relationships involved, time and space do not permit a detailed summary of the disorganized mass of testimony (produced from 30 days of trial and reflected in 3,074 pages of reporter's transcript) relating to the complex mechanical involvements resulting in the bus failure. However, our complete and exhaustive examination of the evidence includes due consideration of whatever conflicts arise from the testimony and whether they are substantial enough to justify a reversal of the judgments of nonsuit.

"The granting of a motion for nonsuit is warranted '. . . when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.' " (*Raber* v. *Tumin*, 36 Cal.2d 654, 656 [226 P.2d 574].) Thus, before a judgment of nonsuit can be disturbed, there must be some substance to plaintiff's evidence upon which reasonable minds could differ; proof that raises mere speculation, suspicion,

surmise, guess or conjecture is not enough to sustain his burden. (*Eramdjian* v. *Interstate Bakery Corp.*, 153 Cal.App. 2d 590 [315 P.2d 19]; *Strnod* v. *Abadie*, 181 Cal.App.2d 737 [5 Cal.Rptr. 627]; *Farmer* v. *Fairbanks*, 71 Cal.App.2d 70 [162 P.2d 26].) ". . . as pointed out in *Reese* v. *Smith*, 9 Cal.2d 324, at page 328 [70 P.2d 933] : 'If the existence of an essential fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not his adversary. [Citation.] A judgment cannot be based on guess or conjectures. [Citation.]' . . . Substantial evidence is required to establish each essential affirmative allegation—a scintilla of evidence is not sufficient for that purpose. (*Estate of Teed*, 112 Cal.App.2d 638, 644 [247 P.2d 54].)" (*Oldenburg* v. *Sears, Roebuck & Co.*, 152 Cal.App.2d 733, 741 [314 P.2d 33].) ██ Thus, the burden was upon plaintiffs to establish that defendants had some duty to them and breached it, and that such breach was the proximate cause of the accident; if there is no evidence of substance tending to prove the controverted facts necessary to establish the plaintiffs' case, the motions for nonsuit were in order. And ". . . 'It is not necessary that there should be an absence of conflict in the evidence. To deprive the court of the right to exercise this power, if there be a conflict, it must be a substantial one.' [Citations.]" (*Rufo* v. *NBC Nat. Broadcasting Co.*, 166 Cal.App.2d 714, 719 [334 P.2d 16]; *Farmer* v. *Fairbanks*, 71 Cal.App.2d 70, 73 [162 P.2d 26].)

### Nonsuits as to Crown Coach Corp.

Appellants contend that Crown sold the bus to Foster September 28, 1956, and *at that time* it was in a dangerous condition, it made no inspection of the bus, the air line was dangerously located thereon, there was no emergency brake, "it is probable" that the safety hanger guarding the drive shaft was broken, and the front hydraulic brakes had been disconnected; that Crown guaranteed to Foster the safety hanger would always control and contain a separated drive shaft; and that by extending the chassis Crown created stress and strain ultimately causing the drive shaft to separate. (A.O.B., pp. 11-12.)

██ Bearing in mind that plaintiffs' claim is based on negligence and that Crown is not an insurer, and a breach of duty to them must be shown; considering the condition of the bus in 1951, its use, service, repair and maintenance by Foster

since that time and its condition at the time of the accident; and applying the foregoing rules, we find no substantial evidence on which reasonable minds could differ which would support a conclusion, or even an inference, of negligence on the part of Crown which proximately caused or contributed to the bus failure.

Contrary to appellants' contention that the sale of the bus to Foster took place on September 28, 1956, when Crown gave Foster a bill of sale, the evidence shows that the bus was actually sold to Foster on October 1, 1951. On that date bus 49 was delivered to Foster by Crown pursuant to a "Lease of School Bus with Option to Purchase," which, in the course of its business, is the regular method used by Crown to effect a sale upon execution of the document and delivery of the vehicle. The lease-purchase agreement was always intended by both parties to constitute a sale contract and was utilized by Crown as a method of sale without down payment in order to satisfy the bank which had refused to take conditional sales contracts without money down; and under this system the "bill of sale," delivered upon the last payment under such an agreement, constitutes no more than an invoice. On October 1, 1951, upon execution of the lease-purchase agreement, Crown immediately filed with the Department of Motor Vehicles a "Dealer's Report of Sale and Application for Registry" listing Foster as purchaser and registered owner, and Bank of America as legal owner. Thereafter, Crown had no connection with the ownership, use, service, repair, maintenance or inspection of the bus. That Foster also considered the bus to have been "purchased," by it on October 1, 1951, is borne out by the evidence that Foster was the registered owner from that date, made regular payments on the purchase price, at all times treated the bus as part of its equipment, never returned it to Crown, never referred it to Crown for any purpose relative to its mechanical condition, maintenance or repair, and, exclusive of Crown, handled all mechanical repairs, maintenance, service and inspections. The acts and conduct of the parties in the light of the lease-purchase agreement, and before any controversy arose as to its meaning, and the intention they reflect (*Woodbine* v. *Van Horn*, 29 Cal.2d 95 [173 P.2d 17] ; *Beneficial Fire & Cas. Ins. Co.* v. *Kurt Hitke & Co.*, 46 Cal.2d 517 [297 P.2d 428]), are susceptible of only one interpretation—that the parties intended the transaction of October 1, 1951, to constitute a sale, that Crown "sold" the bus to Foster and the latter "purchased" it on that date, and

that any legal responsibility for the condition of the bus must be imposed upon Crown as of October 1, 1951.

It is undisputed that an unusual sequence of events, involving several successive mechanical failures, caused the accident. Sometime before the accident, two of the four bolts holding the face plate of the universal joint to the brake drum were missing, thus, there were only two bolts in place; a twisting or pounding action caused these two remaining bolts to loosen and back partially out of their holes (one about 3/16ths of an inch, the other ½ an inch), and become crystalized. Immediately before the accident there was a sudden force sufficient to cause both bolts to shear off and drop to the street. The bolts gone, the face plate of the front universal flayed around to where it damaged the brake drum causing the drive line to separate and break through the edge of the brake drum. The safety hanger, having previously been broken, failed to hold the separated drive line in a safe position and permitted the drive line to fly to the left out of the ''confines'' of the hanger far enough to strike an exposed copper line feeding air to the rear brakes, causing the air line to break resulting in a loss of air rendering the air brakes useless. The front wheel brakes previously having been disconnected by Foster, and the auxiliary brake, which operated on the drive shaft, having been rendered inoperative when the drive shaft separated the vehicle could not be stopped and crashed into the bridge.

An examination of the bus immediately following the accident disclosed that—the forward section of the drive line or shaft was separated from the drive-line brake drum where the companion flange of the universal joint ordinarily was secured by four bolts with lock washers; the safety hanger was severed on the right shaft at the point where the curved loop to form the U would have started; two broken ends of bolts were in two adjacent holes of the four threaded holes in the hub of the drive-line brake drum; there was damage to the threads of the two holes still holding the broken bolts— the threads were elongated, not round; the two remaining holes were empty, clear of bolts or parts, free of dirt, and the threads were clean, round and not damaged, but had grease in them; the air brake line located between the left frame channel and the separated end of the drive line which serviced the brakes on the rear wheels, was broken and pulled apart with fresh beat marks; the front brakes were disconnected; the hydraulic brake lines in the vicinity of the drive-line separa-

tion were intact (although the hydraulic brake system had been completely disconnected with the master cylinder sealed off since 1952); and the auxiliary or hand-brake shoes or bands were in a locked position on the drive-line brake drum. Three days after the accident, two broken bolt ends were found 3 or 4 feet apart on the downgrade portion of the road just before the bridge; the broken ends matched the fractured ends in the hub of the drive-line brake drum; no lock washers or intact bolts were found.

The bus was manufactured and assembled by Crown in 1951. When Foster ordered the bus, it specified a Wayne body (Richard Industries, Inc., manufacturer of the body, joined as a party defendant, was eliminated from the trial by summary judgment), but no particular chassis. Crown had on hand a chassis with a 154-inch wheel base which it had obtained from International. However, the body was longer than the wheel base could accommodate and, because chassis were difficult to procure in 1951, Crown had the frame extended by Lambert, a specialist, whose company was experienced in extension work. He double-framed the chassis to extend it to a total wheel base of 246 inches by "gloving the frame," a method which doubled the strength of the original chassis, and is more efficient than other methods of extending frames. It was not necessary for Lambert to loosen or touch the section of drive-line or its connection which attached to the drive-line brake drum, since the added section of drive-line would be placed either in the center section or the rear section, probably the center. (The drive-line was not defective; after the accident it was still within the confines of the broken hook ends of the safety hanger; and at no time did the severed end of the drive-line drop to the pavement.)

While for their contention—that by extending the chassis Crown created stress ultimately causing the drive shaft to separate—appellants rely upon the opinion of one Snyder—that the extension effected a "change in the stress characteristics" of the frame—Snyder was wholly unable to relate his opinion to the separation of the drive-line on this bus, and it at most, constitutes but guess and conjecture unsupported by reasonable basis. He could not specify the actual effect of the extension on bus 49; he was unprepared to say exactly what caused the drive-line to separate; he was unable to explain his opinion except to say that the fact "the thing" came loose "indicates that something has been changed in the vehicle to cause stress to be concentrated in that particular area";

he would not and could not say what the change was or how the line separated, and conceded that for any particulars he would have to make further tests with respect to specific considerations. He admitted he "did not run any analysis of it to find out what the general effect was theoretically or anything else," and that he was "not prepared" to show how "the extension" changed the stress and the structure of the chassis or how it contributed to this accident. He vaguely explained "something caused it to come apart. I told you that I didn't pinpoint the exact reason why the stress—why the front universal came apart"; and conceded that if for 2½ years the bus was operated without one bolt in the universal joint working loose (which was a proven fact), it would indicate that whatever stress or strain existed was within the range of the joint's ability to handle or within the limits the structure could contain at that time.

Before delivering the bus to Foster, Crown installed a safety hanger. Appellants, assuming the bus was sold September 26, 1956, contend "it is probable" the safety hanger was broken when the bus was sold to Foster; and that Crown guaranteed the safety hanger would always control and contain a separate drive shaft. Under the evidence no conclusion that the safety hanger was broken in 1951, when the bus was actually sold by Crown, could possibly be reached; moreover, the contention that Crown guaranteed the safety hanger is without basis in the evidence or under the pleadings for their claim is predicated on negligence, not breach of warranty. The safety hanger was regulation type (referred to as a U-hanger or U-bolt) which encompassed the drive line approximately 12 inches to the rear of the drive-line brake drum; it was affixed to a metal cross member of the frame by nuts clinched up tight on each side of the frame utilizing threads located on the shaft of the open end of the safety hanger. There was no evidence the manufacture of the safety hanger was improper, or that it was of improper design, or not properly inspected for defects prior to installation, or if there were defects, that they should have been discovered. While Snyder testified that in his opinion the safety hanger was installed by Crown in a stressed position causing the metal to fatigue setting up a gradual fracture that ultimately broke, again his opinion constitutes no more than his guess without support in the record. He claimed the stress was caused by springing the open ends of the hanger inward to fit the holes in the frame cross section to which it was attached; however, again there

is in neither his own testimony nor the evidence, a reasonable basis for his conclusion. He admitted that the metal used in *this* safety hanger (cold rolled or hot rolled steel) had no "spring" in it; that "it should be pretty neutral if you bend it. It is rather soft." Finally he said he did not know how much spring would be in a U-hanger with a 10-inch shaft bent from a spread eagle position to about 2 inches, without running a test of the steel. While Pinker testified a flaw in the metal, "conceivably" existing when it was being "rolled in the steel factory into a rod," caused the break, there is no evidence that Crown knew or should have known of such a flaw, or that it would have been discoverable or that the safety hanger was fractured or broken when the bus was sold to Foster in 1951. It is undisputed that prior to the accident, it had been broken only from a week to a couple of years (at most since 1955), and there is no evidence of negligence on the part of Crown in installing the safety hanger. That the hanger had been broken for some undetermined period of time before the accident (a week to a couple of years) is based upon the uncontroverted fact that the exposed broken ends of the safety hanger were encrusted with rust, grease and grime and there were no beat marks on the broken shaft of the short piece to indicate that the drive line had struck it. Thus it must have broken while in Foster's possession and Foster either did not, by proper inspection, discover it, or knew of it and failed to repair it. The last inspection made by Foster was 21 days before the accident; Norman Foster used a "creeper," but inspected the safety hangers visually without use of artificial light; he did not recall feeling them. He testified that sometimes, to pull himself around on the "creeper" under the buses, he "grabs ahold" of anything convenient including safety hangers; he also testified that in the transmission work in 1954 requiring disconnection of the drive line, the safety hanger would have been loosened, but later said it would depend upon the mechanic and could not state whether this safety hanger had been removed or replaced.

When Lambert returned the extended chassis and after Crown finished assembling the bus, it was tested, and in accordance with ordinary practice, the bus was checked out and road tested before delivery to Foster. The overall weight of bus 49 was 11,540 pounds; assuming a full capacity of 60 students and a driver, it was within the weight specifications of identically equipped International chassis except for the

"slightly longer" wheel base. "The wheel was easy to handle" and "it was a very easy steering bus."

Upon delivery to Foster in 1951, the bus was powered by a conventional front-end engine with a standard transmission immediately to the rear of the engine, and a drive line or drive shaft running from the rear of the transmission to a differential housing and the rear axle which attached to a pair of dual rear wheels. The drive line was in three sections utilizing four universal joints in the connections from the transmission to the differential. The forward end of the forward section of the drive line was attached, through one of the universal joint units, to the hub of the drive-line brake drum, which in turn, was attached to the rear extension of the transmission. The universal joint connecting the forward portion of the drive line to the hub of the drive-line brake drum had a plate attached to it, commonly referred to as a companion flange, with four holes in it which made up to form the threaded holes in the hub of the drive-line brake drum, and the companion flange of the universal joint was secured to the hub of the brake drum by use of four bolts secured by lock washers. The use of the four bolts with lock washers in the connection was the standard method and practice followed in the industry and constituted good engineering practice. Under normal operations, connecting bolts properly installed with such washers do not come out; they are "notorious for staying put"; and International designs its chassis so that the bolts with lock washers stay in place for the life of the equipment. For 2½ years after 1951, up to the time Foster first disconnected the drive line, the bolts remained tight. The bus had two separate brakes—a hydraulic service brake system which activated brake shoes or wheel drums on the four wheels through a single master cylinder and vacuum power booster upon depressing the foot pedal, and an auxiliary brake operating on the drive line. The hydraulic lines for the service brake running to the brake shoe on the rear-wheel drum were within the confines of the U-shaped channel of the frame of the chassis. The Vehicle Code in 1951 did not require more than one set of brakes (§ 670), and the only specific requirements related to stopping distances at certain speeds. There is no evidence the service brakes did not meet Vehicle Code standards. Moreover, there is no evidence that the service brakes on the bus at the time it was sold to Foster in 1951 in any way proximately caused or contributed to the failures leading up to the accident for they were completely discon-

nected by Foster in 1952 and substituted by an air brake system; in fact, had Foster permitted the hydraulic system to remain, the bus would have had service brakes since the hydraulic brake lines came within the confines of the frame channels protected from the separated end of the drive line, and were not damaged. The auxiliary brake was actuated by a hand-operated lever adjacent to the driver's seat and operated on two brake shoes upon bands on a drive-line brake drum transmitting braking power to the rear wheels through the drive line. This brake did work at the time of the accident, and did stop the drive-line brake drum attached to the transmission, but failed to halt the vehicle inasmuch as the drive line was separated. Appellants refer to this brake as the "parking" brake and claim there was no "emergency" brake. But the evidence shows that it could stop the vehicle, although not on a regular or daily basis; in fact, by transmitting the braking power through the drive line, there was a 6 or 7 to 1 ratio advantage to the rear wheels which was of great importance, in so far as leverage is concerned, in utilizing a hand-operated lever for emergency stopping purposes. In any event, the auxiliary brake was standard equipment in the industry in 1952 for a vehicle the size of bus 49; at the time there was no requirement in the Vehicle Code for a hand, parking, emergency or auxiliary brake. Moreover, all of the conventional-type Foster school buses, where the engine was in front, were equipped with such auxiliary brake and actuated shoes or bands on a drive-line brake drum; and the brake equipment was no different on similar buses used at that time by other bus companies in Los Angeles. Crown did not touch either the hydraulic brake system or the auxiliary brake; nor had it any connection with the subsequent change to air brakes or the location of the air brake line.

After October 1, 1951, the bus underwent substantial repairs and was serviced, maintained, repaired and inspected by, and under the direction of, Foster. In the summer of 1952, to increase the braking power, Foster had the service brake system completely changed—the hydraulic brakes were removed from the rear wheels and an air brake assembly was installed by Truck Brake Service Co., Inc. It left the hydraulic brakes on the front wheels, arranging their activation by air. In installing the air system Truck Brake installed the air line but it is controverted that it did not locate the air line within the protected channel of the frame. (The jury later found Truck Brake was not negligent.) In any event, it is

certain that prior to the accident the air brake line was in a position exposed to a drive line that might separate; and that the exposed air line was in fact severed by the rotating end of the drive line immediately before the accident. A short while after the bus was returned to Foster by Truck Brake, Foster mechanics disconnected the front hydraulic brakes rendering them inoperative. In 1954 Foster did extensive work on the clutch. Up to this time there had been no loosening of the four bolts where the companion flange of the universal joint attached to the drive-line brake drum. However, to work on the clutch Foster mechanics disconnected the forward section of the drive line from the drive-line drum; the four bolts in question with their washers were removed, then replaced. In 1955 Foster detached the drive line for further work; the four bolts and washers were removed and replaced. The bolts were again removed in April 1957 in order to put new bearings in the transmission; and then replaced. From 1956 through 1957 a Foster mechanic replaced some bolts in the drive line but he had not the vaguest idea of their condition. He found missing lock washers on the bus and testified that "usually a lock washer breaks and that leaves the bolt free." He recalled tightening the bolts in the universal joint only because he periodically did so on all buses, since it was common to find loose bolts, and monthly inspections were to guard against them. Immediately after the accident two of the four holes in the parking-brake drum used to secure the universal joint on the drive line were found empty with threads undamaged and the openings round. The lips of the other two bolt holes containing the broken bolts were oblong from the pounding by the shanks of the two bolts that had broken off. Before the bolts broke, one backed out of position 3/16th of an inch and the other $\frac{1}{2}$ inch; they broke off at the same time, for the two broken bolts were found within a few feet of each other on Bohlig Road. However, no intact bolts or lock washers were found. Thus if the two missing bolts had worked out of the threads as had the broken bolts, the holes would have shown some damage from the beating of the shanks. They also would have been found on the street. Had lock washers been on the two bolts that broke off they would have come off the companion flange at the same time the broken bolts came loose and been found in the area with the broken bolts; also the two bolts remaining would not have partially backed out of position. This leads to only one conclusion. Foster was either negligent in failing to replace two bolts or in replacing

them failed to properly tighten them with lock washers; was negligent in failing to use lock washers on the two remaining bolts to prevent them from working loose; or was negligent in its inspection of the joint in failing to discover the loose or missing bolts and washers or if it detected the same, in failing to repair.

Appellant argues that the issue of proximate cause, particularly with reference to foreseeability and intervening cause, should have gone to the jury. ▮▮▮ We have concluded from the evidence that there is no substantial evidence, upon which reasonable minds could differ, that would support a finding of negligence on the part of Crown. We find no evidence of negligent manufacture, negligent design, or negligent inspection by Crown. It is clear that the failures resulting in the accident were immediately and directly caused by outside sources which were remote and with which Crown had no connection, rather than by any inherent defect or danger created by its manufacture or design of the bus. It appears as a matter of law that nothing Crown did was the proximate cause of the mechanical failures. (*Poore* v. *Edgar Bros. Co.*, 33 Cal.App.2d 6 [90 P.2d 808].) ▮▮▮ And on the issue of foreseeability ''the law holds a wrong doer responsible in damages only for the natural and probable result of his wrongful acts, and for the injurious effects thereof which he might have reasonably foreseen,'' not for the unusual (*Johnson* v. *Union Furniture Co.*, 31 Cal.App.2d 234, 238 [87 P.2d 917]); '' ' ''One is bound to anticipate and provide against what usually happens and what is likely to happen . . .'' ' '' (*Bush* v. *Weed Lbr. Co.*, 63 Cal.App. 426 [218 P. 618]), but not what is ''unusual'' or ''unlikely to happen'' or what is ''remotely'' or ''slightly probable.'' (*Redfoot* v. *J. T. Jenkins Co.*, 138 Cal.App.2d 108 [291 P.2d 134].) This is not a situation in which the evidence is such that reasonable minds might differ concerning the foreseeability of the intervening acts of Truck Brake and Foster; thus, it is a matter of law (*Richards* v. *Stanley*, 43 Cal.2d 60 [271 P.2d 23]; *Azcona* v. *Tibbs*, 190 Cal.App.2d 425 [12 Cal.Rptr. 232]) not a question of fact for the jury.

Any suggestion that the doctrine of res ipsa loquitur applies is without merit. ▮▮▮ ''A plaintiff seeking to invoke the doctrine of res ipsa loquitur against a defendant who at a time prior to the accident has relinquished all control of the instrumentality causing the injury must affirmatively establish that the condition of the instrumentality has not changed

since it left the possession of defendant. [Citations.]" (*Trust* v. *Arden Farms Co.*, 50 Cal.2d 217, 220 [324 P.2d 583].)

Appellants cite numerous safety orders and Vehicle Code sections which they contend Crown violated when it sold the bus to Foster. The evidence shows that before sale and delivery of the bus Crown inspected the same and made a road test (Veh. Code, § 660 (1955)). Nor is section 670, Vehicle Code, applicable; it too became effective in September 1955, four years after the bus was sold by Crown (1951); section 684, effective in 1955, applies only to the sale, lease, and installation of equipment for use in a vehicle and not to the sale of new vehicles or the sale of used vehicles in which no equipment has been replaced. (*Smith* v. *Peterson*, 131 Cal. App.2d 241 [280 P.2d 522, 49 A.L.R.2d 1194]; *Poore* v. *Edgar Bros. Co.*, 33 Cal.App.2d 6 [90 P.2d 808].) Nor are the cited sections of General Order No. 98, Public Utilities Commission, applicable to Crown under the evidence.

The judgments of nonsuit in favor of Crown are affirmed.

### Nonsuits as to International Harvester Company

Predicated on negligence, appellants contend that International, knowing Crown "would probably" use it for a school bus, provided a chassis without an "emergency" brake and with a "flimsy, inadequate" cross member to which a safety hanger "should be" attached. (A.O.B., p. 12.)

International manufactures chassis; on March 3, 1951, Crown ordered an L-170 chassis with 154-inch wheel base, and on June 6, 1951, International delivered the same together with another L-170 chassis later used by Crown to make a fire truck. Crown did not disclose to International its intended use of the chassis, or that it was to be utilized in any specific vehicle. It is likely Crown did not then know how it would be used; did not order it for any particular purchaser; in fact, Foster had not yet placed its order for a bus. At that time Crown was not only assembling school and passenger buses, but buses of nearly every kind and size, and fire trucks, for which it purchased chassis of all sizes, not only from International, but from Ford, Chevrolet, General Motors, Reo, White, Mack, et cetera. These chassis were frequently ordered or obtained long before the vehicles on which they were ultimately used were ever ordered. There is no evidence that International knew, or could have known, that Crown would use the chassis in question for a school bus or a vehicle of any particular size; nor is there any evidence that after June 6,

1951, International ever again saw the chassis or the same was ever referred to it for any purpose, or that International had any part in altering the same or making up or assembling bus 49.

When delivered by International to Crown, the chassis had, among other things: a four-wheel hydraulic-brake system with the hydraulic line in the channel of the frame where it could not be (nor was it) struck by a separated drive shaft; an independently operated auxiliary brake (referred to as a "parking," "hand" or "emergency" brake) which worked on the drive line at the transmission; three universal joints with two sections of drive shaft or line, the forward universal joint and forward end of the drive line being attached by a flange with four bolts and lock washers to the rear of the transmission and parking-brake drum; and a cross member with two oval holes intended to be used to anchor the cab of a truck or like body.

Thereafter Crown extended the total wheel base to 246 inches, and added the third drive-line section (probably in the center), the fourth universal joint and its wiring, a hydraulic-brake line, and a safety hanger. Crown affixed the safety hanger to the cross member a few inches to the rear of the front universal joint by using the two oval holes.

While Crown installed the safety hanger (it was not claimed, nor does the evidence show, that International supplied, made up or had anything to do with putting it on bus 49, or even knew it was to be, or had been, installed), appellants argue that International was negligent in providing a "flimsy," "inadequate" cross member to which a safety hanger "*should be*" attached. There is no evidence to support any conclusion that the cross member was "flimsy" or "inadequate" for its intended use, or even for a safety hanger, for there is no showing that anything relating to the cross member contributed to the failure of the U-bolt to hold its load; or that the cross member was an item to which a safety hanger "*should be*" attached, inasmuch as the intended use of the cross member was not for a safety hanger; or that International ever knew or should have reasonably foreseen the nonintended use made of the cross member and its oval holes, or that Crown would affix a safety hanger thereto. To the contrary, the evidence clearly reveals that the cross member with its oval holes was intended to be used for anchoring the cab or like body; that it was never intended for the installation of a safety hanger or to contain the drive line in the

event it separated; and that had the U-bolt not been broken it would not have damaged the structure of the cross member, and the drive line would have been retained close enough to its original position that it would not have struck the air line.

As to the auxiliary brake, there is no evidence that it was defective, improper or inadequate for the L-170 chassis used according to specifications or for the intended size and weight of the bus. Appellants claim International was negligent in not providing an "emergency" brake. However, in 1951 an "emergency" brake, either as a substitute for the auxiliary brake or as an additional or third brake, was neither standard equipment nor ordinarily used or known in the industry. The auxiliary brake was used at the time of the accident, did operate and did stop the drum attached to the transmission, but failed to hold the bus, not because of any defect in, or inadequacy of, the brake, but because the drive line had previously separated behind the brake drum. There is much testimony relative to the auxiliary brake known and used in 1951 on vehicles similar to bus 49, but all of the evidence shows that all well-known makes of chassis had the same auxiliary brake, located in the same manner as on bus 49, and that it constituted standard, and the only then used, equipment; and unknown at that time was the efficient practical "emergency" brake contended for by appellants, used either in addition to or in place of the auxiliary brake on vehicles the size and weight of bus 49. In 1951 the Vehicle Code did not require more than one system of brakes (§ 670); thus the hydraulic system of service brakes without the auxiliary brake would have been sufficient. However, International supplied a chassis with two brakes—the four-wheel hydraulic brakes and the auxiliary brake, each constructed separately from the other so that a failure of one part of the operating brake mechanism would not render ineffective the other. These two brakes complied with General Order No. 98, Public Utilities Commission.

We find no evidence of negligence on the part of International in either the design or construction of the original L-170 chassis, and no liability under the numerous cases cited by appellants; nor is there evidence that International did or contributed anything as a proximate cause of the mechanical failures leading up to the accident. None of the lengthening, installation of the safety hanger or subsequent brake work can be charged against it; and it had no reason to foresee or anticipate these changes or the failures ultimately

leading up to the accident. For example, under the original chassis, if a separation of the drive line were to occur, it could be foreseen that the brake operating thereon could become ineffective; but it could *not* reasonably be foreseen that a separation of the drive line would at the same time render inoperative the other brakes leaving the vehicle without braking power. (International's construction of the two brake systems was such that failure of one would not render the other ineffective.) What ultimately occurred causing the bus failure, was due to a series of intervening acts which could not reasonably be anticipated or foreseen—disconnection of the hydraulic brakes; installation of the air brake system; exposure of the air line where it could be, and was severed by a separated drive shaft; reconnection of the drive shaft and flange to the brake drum in such a way that the four bolts failed permitting the separation of the drive shaft; and a broken safety hanger (an item of equipment not contemplated by International) which failed to contain the separated drive shaft which struck and severed the exposed air line incapacitating the air brakes on the rear wheels.

Under the evidence International cannot be held as an insurer; thus, there must be some showing of negligence in its construction or design of the chassis based on reasonable foreseeability. International was under no duty to exercise utmost care or caution; its duty was to exercise ordinary care. "In the first place, negligence must be proved, in accordance with the general rule of manufacturer's negligence . . . [i]n the second place, . . . Injury or damage must have been foreseeable, reasonably, by a prudent manufacturer . . . ." (*Fentress* v. *Van Etta Motors,* 157 Cal.App.2d Supp. 863 [323 P.2d 227]; *Trust* v. *Arden Farms Co.,* 50 Cal.2d 217 [324 P.2d 583].) And as to what is reasonable foreseeability of harm which is essential to the concept of negligence, the court said in *Tucker* v. *Lombardo,* 47 Cal.2d 457, 464 [303 P.2d 1041] : " 'On the other hand, one is not bound to foresee every possible injury which might occur, or every possible eventuality, but only those which were reasonably foreseeable; and one is not required to anticipate against dangers which it is not his duty to avoid.' [Citation.]" "Remote possibilities," "bizarre circumstances" (*Fentress* v. *Van Etta Motors,* 157 Cal.App.2d Supp. 863 [323 P.2d 227]), "the unusual" (*Johnson* v. *Union Furniture Co.,* 31 Cal.App. 2d 234 [87 P.2d 917]) that "unlikely to happen," or what is "remotely" or "slightly probable" (*Redfoot* v. *J. T. Jenkins*

*Co.,* 138 Cal.App.2d 108 [291 P.2d 134]), by which an article can become harmful, removes it from the rule of manufacturer's liability.

Appellants have cited numerous cases factually foreign to the one at bar and they do not here legally support a finding of negligence or proximate cause. While generally the question of intervening or superseding cause is one of fact, the evidence before us is such that reasonable minds could not differ as to whether a duty should be imposed; the only reasonable conclusion the evidence justifies is that there was neither duty nor breach; thus it was a question of law for the court. (*Richards* v. *Stanley,* 43 Cal.2d 60 [271 P.2d 23] ; *Gonzalez* v. *Derrington,* 56 Cal.2d 130 [14 Cal.Rptr. 1, 363 P.2d 1].) We cite the principle stated in *Azcona* v. *Tibbs,* 190 Cal.App.2d 425, 428 [12 Cal.Rptr. 232], as controlling: ''General tort law provides that an injured person cannot recover for damages caused him unless the negligent conduct upon which he bases his claim is a proximate cause of the damage of which he complains; . . . Ordinarily proximate cause is a question of fact, but where, as here, the facts are undisputed, and only one conclusion may be drawn from them, it becomes one of law. (*Rosa* v. *Pacific Gas & Elec. Co.* (1955) 133 Cal.App.2d 672, 674 [284 P.2d 844] ; *Gallichotte* v. *California Mut. etc. Assn.* (1935) 4 Cal.App.2d 503, 509 [41 P.2d 349].) It is clear that an original act of negligence is not a proximate cause when the injury directly results from the intervening act of another, which is an act not to be reasonably anticipated by the first party as likely to occur and follow through from his own act. (*Arthur* v. *Santa Monica Dairy Co.* (1960) 183 Cal.App.2d 483, 488 [6 Cal.Rptr. 808] ; *Stasulat* v. *Pacific Gas & Elec. Co.* (1937) 8 Cal.2d 631, 637 [67 P.2d 678].)''

 Judgments of nonsuit in favor of International Harvester Company are affirmed.

NONSUITS AS TO CHARLES FOSTER AND NORMAN FOSTER

 There is merit to appellants Smiths' contention that there is in the record before us evidence of negligence which would have been sufficient to support a verdict against Charles and Norman Foster.

Foster Transportation, Inc., was a small family corporation owned by Bernice and Charles Foster. Norman was a maintenance mechanic for nine years; for three of those he held the title of maintenance superintendent with duties ''as

head mechanic in the maintenance department,'' superintendent in charge of inspection and superintendent in charge of making repairs. Norman personally did the most important mechanical repairs, with or without the assistance of other mechanics, and inspected the buses; the record is replete with evidence that as an ordinary maintenance mechanic he personally made numerous repairs on bus 49. Whatever may be his actual position with the corporation, there appear to be three critical areas in which the evidence leaves substantial questions of fact relative to active negligence which should have gone to the jury—the installation of the four bolts, the safety hanger and malposition of the air line.

In April 1957, approximately six months before the accident, Norman personally did part of the work in dismantling the transmission and drive line for, the installation of new bearings, during which the four bolts in question were removed and should have been replaced after the job was finished. To secure the universal joint, the four bolts had to be installed with lock washers and drawn up very tight; properly installed bolts with lock washers remain in place for years. It is undisputed that up to the time Foster mechanics first disassembled the universal joint (1954) the bolts were tight; after 1954, they remained tightly in place until 1955, when they were again removed by Foster. As to whether Norman, in reassembling the universal joint in 1957, actually replaced all four bolts or properly tightened the bolts with lock washers, there exists in the evidence a substantial conflict—created by the nature of his own testimony, and the condition of the bus at the time of the failure and immediately after the accident. He testified that had lock washers not been put on "he would have noticed it"; at the coroner's inquest he testified that he inspected the work after reassembly but, "did not recall whether lock washers were there or not." Then, relative to inspecting the bolts for tightness and the presence of lock washers three weeks before the accident, his testimony was at some variance with that given by him on deposition and at the coroner's inquest. But the undisputed fact is, that for an undetermined time prior to the accident, two of the four bolts were missing so that only two bolts remained to hold the face plate; finally, immediately before the accident these two, having partially backed out of their holes, sheared off at the same time; and in the vicinity where the broken bolts were found no other bolts or lock washers were found. In view of this, there having been no evidence

that bus 49 was out of the control of Foster from April 1957 to the time of the accident, and the evidence having established that Norman personally participated in the reassembly of the transmission and inspected the work after it was done, the only reasonable inference is—that upon reassembly he either negligently failed to replace two of the bolts and did not properly tighten the other two; or he negligently failed to install all four bolts with lock washers; or he did not properly inspect them to detect their defective installation, or if he did, he negligently failed to correct it.

Relative to the safety hanger, all of the evidence points to a break existing in the U-bolt for an undetermined period— (a week to a couple of years) prior to the accident. Inasmuch as the bus was within the control of Foster after 1952, the evidence supports the inference that Norman either negligently broke it by using it as a convenient thing by which to pull himself around on the "creeper" under the bus, or he made a negligent inspection of the safety hanger failing to detect the break, or if he detected the fracture he negligently failed to repair it. He personally inspected the safety hanger 21 days before the accident; he believed he would have noticed it if it had been broken; he used a "creeper" but inspected it visually without use of artificial light and without feeling it.

As to the air brake line, Norman admitted that from 1952 he was personally aware that it ran in an exposed position, but neither he nor anyone else changed the air line. However, Green's testimony shows that when he (Green) installed the air line system for Truck Brake in 1952, the air lines were clipped to the lower channel and placed in a protected area; and that Truck Brake upon delivery of the bus to Foster did no more work on it. (The jury obviously believed Green for it found Truck Brake free of negligence.) The uncontroverted evidence is that the air line was in an exposed position outside the channel when it was severed. Snyder, plaintiffs' expert, testified that at the time of the accident the air line was out of the channel because it was fastened at the rear with tape, "It was taped, with an old tape against this little piece of hydraulic pipe. . . ." Green also said he had equipped the air system with a red light or buzzer system when he installed the air lines; but none was found on the bus after the accident. Inasmuch as Green originally placed the air line in a protected area, the air line was exposed when it was severed and was found out of the channel taped in an unpro-

tected position after the accident, and the warning system installed with the air lines was missing, the only reasonable inference is that after 1952 an alteration was made in the air-line system resulting in a removal of the air line from its protected location, and its attachment at the rear with friction tape; and since the bus, after October 1952, was in the control of Foster for service, repairs and maintenance, it also must be inferred that Norman, who made basic repairs, and Charles, who ordered them, negligently created or caused to be created the dangerous location of the air line. In addition, both Fosters knew the front brakes had been disconnected, that the bus depended entirely on the continuity of the air line as the only means to stop it, and there was no emergency brake; yet, knowing the exposed position of the air line and the hilly route over which the bus would go, permitted it to be used, or sent it out for use, in that condition.

Charles Foster, an officer of Foster Transportation, Inc., was also general manager. He was familiar with the buses and their routes and occasionally drove them, and made bus inspections. His relationship with Norman, in connection with the repair and maintenance of the buses, was close; they regularly "talked over" what was to be done on buses, particularly matters relating to brakes. Charles told Norman "what to do"; Norman reported directly to Charles and all reports of inspections and maintenance were made to him. As manager, all basic and major changes were ordered by Charles. He had trouble with the brakes in 1952; he ordered the hydraulic brake system modified to the air system; thereafter, because of trouble in steering he ordered the brakes disconnected from the front wheels; he knew the bus thereafter had no braking mechanism on the front wheels, a hand brake, but no emergency brake; there is evidence of a basic change by Foster in the air-line system resulting in the exposed air line, and that in his position Charles ordered it; he must have known that the air line was taped in an unprotected position (out in the open even a casual inspection would have detected it) and, aware that stopping the bus depended entirely upon the continuity of the air line, designated the bus in this unsafe condition for service on a route with hills.

Whether Norman was an ordinary maintenance mechanic, or a superintendent, or, as a superintendent, an officer of the corporation is a factual question. If in fact Norman could be considered an officer of the corporation, his liability would be governed by the same rules controlling the liability of

Charles, an officer of the corporation. Under *Towt v. Pope,* 168 Cal.App.2d 520 [336 P.2d 276], a corporate officer may be held liable for injury to an employee of the corporation caused by his personal negligence—for malfeasance or misfeasance (some positive or overt act of negligence), but not for mere nonfeasance. (*Thomsen* v. *Culver City Motor Co., Inc.,* 4 Cal.App.2d 639 [41 P.2d 597]; *Dwyer* v. *Lanan & Snow Lbr. Co.,* 141 Cal.App.2d 838 [297 P.2d 490].)

 For the foregoing reasons the judgments of nonsuit in favor of Norman Foster and Charles Foster are reversed.

JUDGMENTS IN FAVOR OF TRUCK BRAKE SERVICE CO., INC.

Judgments in favor of Truck Brake were entered on jury verdicts. Appellants make no claim the evidence is insufficient to justify the jury finding that Truck Brake was free from negligence in performing the brake work, including installation of the air line; they contend only that the jury should have been instructed that Truck Brake had a duty to install an ''emergency'' brake that would operate on the rear wheels independently of the air brake and a warning system showing the escape of air, and was erroneously instructed on the issue of concurrent and intervening cause; and that the trial court erred in failing to reopen plaintiffs' case and grant a new trial, and in allowing certain questions to be put to the witness Green.

 There is no substantial evidence from which the jury could have concluded that Truck Brake had a duty to install an ''emergency'' brake or was negligent in not doing so, thus any instruction thereon would have been improper; and it was proper not to instruct relative to the warning system, for under the evidence, absence of such a system could not have been the proximate cause of, or contributed to, the accident.

In October 1952, pursuant to an inquiry of Green relative to ''increasing the capacity of a brake on a bus that was giving unsatisfactory stopping,'' Foster delivered bus 49 to Truck Brake for the purpose of having ''some work done on the service brakes''; there was no order for work on the auxiliary brake and no request was made to install a third or ''emergency'' brake, or to redesign, replace or reengineer the entire brake system. When delivered to Truck Brake, bus 49 was equipped with two separate and distinct brakes working independently of each other—a service brake

(hydraulic brake system) and an auxiliary brake, the brake drum of which operated on the drive line. The latter is referred to in the industry as a "hand" or "parking" brake, and while also called an "emergency" brake, it is not a true emergency brake even though the evidence shows it would stop the bus, and at the time of the accident did work and applied itself to the drive line but failed to hold the vehicle because the drive line separated. It was the standard and usual type of auxiliary brake used in the trade in 1952 and up to 1957, and all chassis of major manufacturers were then equipped only with this type of brake located at the front end of the transmission in the same place it was located on bus 49. Green testified that he knew of no manufacturer in 1951 or 1952 who supplied a chassis with an auxiliary brake activated anywhere else than on the drive shaft between the transmission and the differential housing, and no truck of any size equipped in 1952 with an emergency brake that would apply brake shoes independently on the rear wheels (it was physically impossible for a driver to set that type of brake sufficiently to hold on a grade). Hand lever brakes were not standard in the industry on buses or school buses in 1952 and were not available. There was considerable testimony relative to "other systems" or alternative brakes, but in each instance they were either unknown or not available in 1952, not standard or not used in the industry at that time, their feasibility or efficiency were unknown or they were impractical, they were not standard for buses or school buses or could not be employed in a bus the size and weight of bus 49, or were not customary or in ordinary use by vehicle manufacturers or brake repair men.

Truck Brake removed the hydraulic brakes from the rear wheels and installed an air brake assembly. (There is no claim or evidence that this equipment was defective or substandard, and the jury found no negligence on the part of Truck Brake in its installation, including the placement of the air line). It left the hydraulic brakes on the front wheels but arranged that they would be activated by air, and from the same foot treadle which activated the rear air brakes. It did not touch the auxiliary brake. However, within a short time after Truck Brake delivered the bus to Foster, Foster disconnected the front brakes (not on advice of Truck Brake) rendering them inoperative.

What appellants here seek is the imposition upon Truck Brake of a duty to install a third brake—what it calls an

"emergency" brake—which would operate independently on the rear wheels. We know of no obligation created by contract, or under the law, requiring it to make any such installation under the evidence before us.

When Foster ordered the work done and brought the bus to Truck Brake, the latter contracted to do nothing more than to increase the braking power of the existing service brakes; its contractual duty cannot be extended to include work on the parking brake, installation of a third or additional brake, or any replacement or reengineering of the entire brake system.

Nor did the standard in existence in 1952 or the statutory law require a brake repairman or bus manufacturer to provide vehicles with more than one set of brakes (Veh. Code, § 670, which applies only to an operator), or an "emergency" brake. When bus 49 left Truck Brake it had *two* effective brake systems—the service brake operating on all four wheels and the auxiliary brake. There is no evidence that the latter was improper or inadequate in 1952, was then faulty or defective, that it was negligence to put it on buses of this type, or that in the exercise of ordinary care other brakes or braking systems should have been used. General Order No. 98, Public Utilities Commission, provides that passenger buses must have: 1. service brakes adequate to control the movement of and stop and to hold stationary such vehicle; and, 2. an auxiliary brake—mechanical hand operated, employing a ratchet and pawl or other effective locking and releasing mechanism which must be capable of holding the vehicle stationary in any situation it is likely to encounter. When the bus left Truck Brake it complied with these requirements. The air brake system operated on all four wheels (the front brakes being later disconnected by Foster). The failure of the auxiliary brake would not render the air brake inoperative or vice versa; in fact it was found applied around the drive line after the accident. Even had the evidence supported the conclusion of the availability of effective other "emergency" brakes in 1952, this alone is not sufficient to justify a finding of negligence for a failure to utilize an alternative method. (*Dillingham* v. *Chevrolet Motor Co.*, 17 F.Supp. 615; *Redfoot* v. *J. T. Jenkins Co.*, 138 Cal.App.2d 108 [291 P.2d 134].)

The evidence shows that a warning system consisting of a buzzer, semaphore or red light to show the escape of air was not in general use in 1952. While Green testified he actually installed a warning system, and Snyder said he could not

find any evidence of one after the accident, its absence could not have been the proximate or contributing cause of this accident. A review of the sequence of events leading up to it discloses the accident would have happened even had such a signal been in existence; and under the circumstances the device would have been useless for preventing the accident. The failures causing the accident began when the two remaining bolts sheared off and the drive shaft separated from the transmission—this would not have activated any warning system; then, the separated drive shaft broke out of the ''confines'' of the safety hanger—nor would this agitate a warning; finally, the free-whipping drive shaft cut the air line—this *would* have set the warning system in operation, but by this time the bus was headed downhill without service brakes, gaining speed and momentum, and the brake drum around the drive line could no longer bring the vehicle to a stop, the drive line having already separated. A warning by such a system at that time could have led to no action of the driver that could have stopped the bus. Moreover, he was aware of the escaping air when the air line was severed; all witnesses heard it; it was sudden—not a slow or gradual escape of air against which preventive action could have been taken by the driver.

For the foregoing reasons, Special Instruction No. 3 was not erroneous for having failed to submit the matter of the ''emergency'' brake and warning system to the jury. Nor does it appear to be improper for any other reason. Appellants do not claim they requested any modification of this instruction prior to its having been given. Further it falls short of being a formula instruction. It is not in itself complete and requires construction with other given instructions; and it does not mention proximate or intervening cause or foreseeability. ▬ It is for this latter reason that if it is a formula instruction, it is unduly favorable to plaintiffs, of which they cannot now complain. (*Barkett* v. *Brucato,* 122 Cal.App.2d 264 [264 P.2d 978] ; *Marshall* v. *La Boi,* 125 Cal. App.2d 253 [270 P.2d 99].)

Appellants claim the instruction on intervening cause was erroneous. It follows regular BAJI Instruction 104C. Their complaint is that by instructing that Truck Brake on October 3, 1952, must reasonably have foreseen that the subsequent intervening act or acts probably would occur and were reasonably likely to cause injury, the court misstated the law on probable cause and intervening or superseding causation. They

advance little argument on this point other than to cite a number of authorities which involve nonsuits, in which no claim of error in instructions was made, or cases in which the instructions were not under discussion. We find nothing in them requiring a conclusion that the instruction, as applied to the instant facts, was erroneous.

A motion to reopen, to permit one Reeves to testify relative to the position of the air line in 1952, made by plaintiffs at the conclusion of the trial and immediately before opening argument, was denied, as was their motion for a new trial on the ground of newly discovered evidence. Requests to reopen (Code Civ. Proc., § 607, subd. 3) and motions for new trial on this ground (*Eley* v. *Curzon*, 121 Cal.App.2d 280 [263 P.2d 86] ; *Baker* v. *Floto*, 122 Cal.App.2d 573 [265 P.2d 158]) are addressed to the discretion of the trial court; and its determination thereon will not be disturbed unless it is clearly shown its discretion was abused.

The affidavit discloses that Reeves' testimony would have been no more than cumulative on the issue of the location of the air line. Norman Foster, a defendant, testified at length that neither he nor anyone else made changes in the air line, and when the vehicle was returned by Truck Brake in 1952 the air line was in the same place it was at the time of the accident. Witnesses testified the air line was in an exposed position before and after the accident. Nor could counsel have been caught by surprise on this issue. The location of the air line was a critical area of inquiry and a main part of plaintiffs' case; it was a matter of dispute from the beginning; it was discussed off and on by witnesses for 30 days of trial. Counsel must have known before he put plaintiffs' expert Snyder on the stand that he could not state the location of the air line in 1952; should have known before Lathrop testified he could not speak of his own knowledge as of 1952; and at the outset was put on notice by Green's testimony under section 2055 that the air line was not placed in a vulnerable spot, yet counsel made no effort until the conclusion of the entire trial to proffer Reeves testimony. The record reflects a complete lack of diligence in calling Reeves. And there is no showing that before then Reeves was not discoverable or unavailable as a witness. It took 2½ years for the case to be brought to trial and 30 days for trial, yet it took counsel only from the afternoon of May 4 to the morning of May 5 to produce Reeves. Moreover, under the evidence there is no reasonable certainty a different judgment would have re-

sulted had Reeves testified. Contrary to appellants' representation that the trial judge believed the question of Truck Brake's liability to be close, the judge actually said there was a serious question in his mind whether "as a matter of law," Truck Brake "should be held in the litigation because of the elements of proximate cause and reasonable foreseeability"—, quite a different matter.

On motions to reopen, the moving party must show diligence; when no showing of diligence in attempting to sooner procure the newly offered evidence is made, that fact alone justifies its rejection (*Giomi* v. *Viotti*, 144 Cal. App.2d 714 [301 P.2d 597]; *Hanson* v. *Wells Van & Storage Co.*, 100 Cal.App.2d 332 [223 P.2d 509]; *Wilson* v. *Gurney*, 123 Cal.App.2d 889 [268 P.2d 77]; *Taylor* v. *Continental Southern Corp.*, 131 Cal.App.2d 267 [280 P.2d 514]); moreover, there is no abuse of discretion in a refusal to reopen where the evidence offered is merely cumulative.

Claim of newly discovered evidence as a ground for a new trial is generally regarded by the courts with distrust and disfavor. (*Nebelung* v. *Norman*, 14 Cal.2d 647 [96 P.2d 327]; *Bliss* v. *Security-First Nat. Bank*, 81 Cal.App.2d 50 [183 P.2d 312].) However, the court is authorized to permit production of newly discovered evidence if its nature makes a different judgment probable (*Bliss* v. *Security-First Nat. Bank, supra*, 81 Cal.App.2d 50), if there is no lack of diligence in failing to produce it at the trial, and if the evidence is not primarily cumulative. (*Landrum* v. *Severin*, 37 Cal.2d 24 [230 P.2d 337]; *Marinucci* v. *Bryant*, 151 Cal. App.2d 298 [311 P.2d 622].) Absent a showing of these elements, and in light of the serious consideration of all the circumstances given by the trial judge in denying the motion, we find no abuse of his discretion.

Appellants claim the court erred in permitting Green's response to two questions. Green, President of Truck Brake, had 35 years of brake-repair experience. He was asked on direct examination: "In thirty-five years, have you ever had an airline installed by you or your company severed by a line drive?"; he answered, "No, sir." A motion to strike was made on the ground the question called for a conclusion of the witness and "no proper foundation." The court said: "As to his knowledge, the motion is denied." The trial judge, having limited the answer to Green's "knowledge," thus permitted not his conclusion but the results of his 35 years of observation and experience; a necessary foundation was laid.

Moreover, plaintiffs had previously and first inquired into the same subject wherein Green was asked under section 2055, Code of Civil Procedure: "And did you, from your many years of experience, have an opinion as to whether these drive lines were notorious for coming out or notorious for staying in place?" and he responded, "It is a very uncommon occurrence."

The second question directed to Green was: "Based on your experience, at the time of installation, was there anything about the work which you performed, with your knowledge of brakes, that caused you to believe that it was possible or that it could be foreseen that this airline could in any way be damaged or cut or broken by a severed drive line?" It was objected to as calling for a conclusion of the witness, invading the province of the jury and as irrelevant, incompetent and immaterial. The objection was overruled and he answered, "No, sir." Green had testified he installed the air brake system and that the air line was not placed in a vulnerable location. Foreseeability and intervening cause were a main issue in the case; the fact of Green's belief at that time is neither a conclusion nor immaterial, and such query predicated on his own experience and his own knowledge at the time he did the act did not invade the province of the jury.

The judgments in favor of Truck Brake Service Co., Inc., are affirmed.

JUDGMENTS IN FAVOR OF TRUCK INSURANCE EXCHANGE
AND TRUCK UNDERWRITERS ASSOCIATION

These judgments were entered on jury verdicts. For the purpose of this appeal the Exchange and Association, both organized in 1935, are treated as one.

Truck Insurance Exchange is an unincorporated association of policy holders organized as an interinsurance exchange; each policyholder upon becoming a member signs a contract for managerial services to be rendered by Truck Underwriters Association, for a fee. In 1957 Truck Exchange had 150,000 policy holders and insured 500,000 vehicles; it paid 16 per cent of its premium receipts to its attorney-in-fact, Truck Underwriters Association, for general managerial services which included—policy service, filing service with the Public Utilities Commission, loss payable services to mortgagees, and supervision of money deposits as well as for maintaining and oper-

ating actuarial, bookkeeping, controller, investment, advertising and other departments.

In 1945, to lessen the accident rate and encourage safe operation, and due to inadequate wartime police supervision on the highways, Truck Underwriters Association established a service primarily for its underwriting department to help underwriters evaluate risks on new applications, and provided a road patrol, all of which resulted in what became later known as the safety engineering program. Those administering this program are called safety engineers—they are truck drivers or driver supervisors, not mechanics or mechanical engineers, they wear regular business suits and are furnished with neither coveralls nor tools. In 1957, there were 38 safety engineers throughout the United States; the total safety engineers' budget was $470,000. In Los Angeles County, there were only two safety engineers serving between 7,000 and 8,000 accounts operating 15,000 to 18,000 vehicles.

The safety engineering program involves road patrol in radar-equipped cars—checking the behavior and driving habits of truck drivers, making road observations and reports, and checking road conditions—safety meetings and award dinners; distribution of pins, cards and safety literature; policy holder contacts and relations; terminal and equipment inspections; dissemination of information concerning the industry; and identification of equipment with a ''T'' (decal) after the policy is written to identify equipment on the road. (Decalling has no connection with inspection.)

Approximately 75 per cent to 80 per cent of the safety engineering program consists of the road patrol service, which is of primary interest to the truck operators. Patrol is done in cars equipped with radar machines which measure speed of trucks on the road. Drivers are told that safety engineers in unmarked patrol cars will observe speed violations and their driving behavior, habits and conduct on the road. Each day the safety engineer writes observation reports and mails one to the operator, that it may know what its drivers are doing, and one to Truck Exchange which uses them for its own purposes.

On the other hand, equipment inspection constitutes but a minor part of the safety engineering program. In 1957 it was performed on only about 2 per cent of the total accounts, and was concerned with operations having five or more pieces of equipment. Equipment inspections are made primarily for the convenience of the underwriting department. When he

receives a new application for insurance, the underwriter requests that a service engineer visit the applicant (operator) to determine and give to him his impression of the desirability of the risk from whatever information he can obtain concerning the account, its driving hazards, the general conditions of the terminal, and the quality of the equipment. The condition of the equipment is determined from an inspection (external check) of the maintenance and general housekeeping of the vehicles. The safety engineer making the inspection brings to the underwriter's attention "anything wrong" or any defect in a piece of equipment, or any refusal of an operator to comply with a request to make a change to correct it. After the policy is issued, a safety engineer in a subsequent inspection, if any, may make recommendations to instigate cancellation proceedings, if conditions warrant. The advertising material of Truck Exchange stresses that it is rendered as a free service to the policy holder; but the primary purpose of the equipment inspection and reason it came into use was to advise the underwriter of the desirability of the risk of a new account. It was never intended by respondents to make the safety engineering program any part of the agreement with the insured; there is nothing in the individual contracts with Exchange subscribers which requires the furnishing of the services of the safety engineering program, nor is there any mention thereof in the contract between the Exchange and Truck Underwriters Association; the program was set up to cut down the accident rate and for the company's own purposes, not for those of the insured; it is not part of the general managerial service or functions performed by Truck Underwriters Association for Truck Exchange; it was not conceived until 10 years after the companies were organized; and it is purely a gratuitous or free service. The equipment inspection is limited only to a visual upper-deck inspection consisting of an external check of the general housekeeping of the equipment—a superficial check of the brakes, horns, lights, tires, paint and general appearance. An equipment inspection is made on a sampling basis; a sample is taken from an operator's vehicles at the terminal (25 per cent or 30 per cent) to see if the fleet is in good shape; equipment away from the terminal is not inspected. On buses the engineers check door steps, lights, jagged edges inside, emergency doors and for flags and flares. An equipment inspection is generally made upon a new application for insurance, but there is no evidence showing any periodic frequency of inspections thereafter, and

while the engineers try to make a routine call once a year on each large fleet owner, they are not always able to do so. Purpose of the inspection is to determine whether the equipment is in good and safe condition; it is not made for the purpose of determining whether it is in good condition mechanically. The engineers are not mechanics, are neither qualified to make mechanical inspections, nor do they do so. They are in fact instructed never to have the motors turned on when inspecting, and not to give advice to operators as to how to keep their equipment in safe mechanical condition. The "Truck Insurance Exchange Vehicle Inspection Report" form (Ex. J.) is used as an inspection guide by the engineers; this form obviously contemplates only a housekeeping inspection and demonstrates by the lack of appropriate blanks or spaces that no inspection of the drive lines, U-bolts, air lines or other undercarriage mechanical items was intended. Moreover, an undercarriage mechanical inspection would be too impractical and expensive for an insurance company. Respondents have neither the manpower, the money, nor the facilities to carry on such a program; they are in the insurance business not in the garage or maintenance business and cannot afford to undertake a competitive service of mechanical inspection or maintenance. Other insurance companies advertise they offer free safety engineering services, including equipment inspection, but none inspects for mechanical condition. Advertising material of Truck Exchange is extravagant in stressing the free safety engineering service which includes, among other things, equipment inspection and road patrol, but "is pretty factual" and appears to be no exaggeration for what the company had in mind. Advertising was not distributed to the public through usual media, but limited to circulation in fleet truck operators' trade journals.

Richard Friend sold Foster Transportation, Inc., its insurance policy. He did not give Charles Foster any Truck Exchange advertising or literature relative to the safety engineering program, and Charles neither saw nor relied on it prior to becoming a policyholder. Friend did discuss with Charles the provision in the policy giving the company the right to inspect the equipment; thus, upon receipt of Foster's application for insurance, the underwriter requested William Gregory, safety engineer, to go to the Foster premises to inspect its equipment to give his impression of the risk. He thereafter made four calls—only the first two involved inspection of equipment. The first was made on October 17, 1956, before

the policy was issued. Gregory met Charles, told him why he was there; he learned from Charles that Foster was keeping preventive maintenance cards for Public Utility Commission requirements; and was assured by him that Foster was carrying on the prescribed Public Utility Commission program of maintenance which included such items as drive lines, universal joints, steering, springs, hangers, air compressing equipment, et cetera. Dressed in a business suit, without tools and without going under any equipment, Gregory checked 16 of Foster's 29 units by going into the buses and checking the aisle, step and coin box conditions, testing the hand brake and its tension, shaking the steering wheel to see if the section box rattled, checking lights and gauges for air pressure, hitting the foot brake to determine the travel and looseness of the pedal, opening emergency doors and checking the exterior including the paint, bent fenders, name plates, et cetera. Gregory neither completed a vehicle inspection report nor made a list of the 16 buses he saw inasmuch as Foster was not yet insured. His report merely described his visit, summarized the type of operation, said of the buses: ''Some are old and some are late models, but they are all in excellent condition and appearance. All are unit numbered and name plated,'' and concluded, ''It is my opinion this would be a very good risk.'' The second and only other equipment inspection took place on January 17, 1957, after the policy had been issued. Gregory checked and decalled 17 buses, which was all of the equipment available to him at the terminal. He suggested that new tires be installed on some, and Charles agreed. Gregory did not inspect the rest of the equipment because of lack of time, and he left some decals for Charles to install on the remaining vehicles. His report stated he had found Foster's equipment in ''top condition''; he attached thereto a list of drivers and the equipment he saw, and noted therein that safety literature, et cetera, had been left and a safety meeting had been arranged. There is no evidence that at this time or in 1956, or at any other time prior to the accident, Gregory ever inspected bus 49, decalled it, or even saw it. On February 4, 1957, Gregory returned to Foster's for a safety meeting only. It lasted approximately 1½ hours and was attended by all employees and management of Foster. He discussed the road radar patrol program, speed, proper parking, picking up and discharging passengers, and safe operation and driving techniques. He did not discuss maintenance or equipment inspections in front of the drivers or mechanics, nor did he make any

inspection of Foster equipment. On June 6, 1957, Gregory, with agent Friend, called at Foster's relative to a policy exclusion to be issued concerning a 65-year-old driver.

At no time did respondents ever have access to Foster's maintenance records to ascertain the frequency of its repairs or maintenance of its equipment; respondents relied entirely upon Foster to maintain all of its equipment and upon Foster's description of its maintenance program. Just as respondents had never intended the equipment inspection part of their safety engineering program to constitute an examination or inspection of vehicles for mechanical defects, neither did anyone connected with Foster Transportation, Inc., rely upon respondents' equipment inspection as a determination that its buses were free of mechanical defects. Before applying for insurance Charles read no literature or advertising material on the safety engineering program, nor relied on the same; when the agent talked to him he stressed to Foster the road patrol program, but warned him that a large number of observation reports could not be expected because its equipment operated locally. Foster did not in any way rely upon Truck Insurance Exchange to see that its equipment was in good mechanical condition, but relied entirely upon its own mechanics for inspections, repairs and maintenance. Nor does the evidence show that the drivers were advised of respondents' equipment inspections or that they relied upon anyone other than the mechanical department of Foster to inspect, maintain and repair the undercarriage of the buses.

Appellants present numerous claims of error relative to instructions, exclusion of evidence and prejudicial misconduct; however, their main contention appears to be that respondents did not conduct an undercarriage mechanical inspection of bus 49 with ordinary care. A review of the evidence reveals that the jury was entirely warranted in making the implied finding that respondents had no duty to plaintiffs to conduct any inspection, undercarriage or otherwise; hence, there was no breach or act or omission of respondents that could be the proximate cause of the accident.

The evidence is clear that the two inspections of Foster's equipment were not of such a nature or performed under such circumstances as to impose any duty, contractual or otherwise, on respondents to make any kind of inspection on Foster's equipment for the benefit of plaintiffs. The only service Truck Underwriters Association agreed by contract to supply was general managerial service—and this was to the individual

policyholder and Truck Exchange; the safety engineering program, of which equipment inspection is part, conceived ten years after the respondents started business, is not a part of the general managerial service. The safety engineering program was conducted as a free or gratuitous service; equipment inspections, only a minor part of that program, were primarily for the company's own benefit although available to the policyholder for whatever it was worth to him; it was in the road patrol service part of the safety engineering program that the truck operators were particularly interested. The only mention of inspection in any contract is found in the insurance policy issued to Foster; and at most, it reserves the legal right to respondents to inspect Foster's equipment if they wish to do so; the contract mentions nothing concerning any duty or obligation on the part of respondents to make an equipment or other inspection. Thus, prior to the issuance of the policy, and for the sole purpose of determining whether Foster was a desirable risk, respondents exercised this right to inspect Foster's equipment; once thereafter it made another inspection and decalled, for identification, the vehicles available, at which time Gregory suggested Foster replace some tires. ▉▉▉▉ However, the mere exercise of this right to inspect for their own purpose, under the circumstances, and their suggestion to replace certain tires, do not, in the absence of policy provision, establish any corresponding duty on the part of respondents to Foster or anyone else to inspect Foster's equipment for good condition or otherwise (*Hayes* v. *Richfield Oil Corp.*, 38 Cal.2d 375 [240 P.2d 580]; *Schwerdtfeger* v. *State of California,* 148 Cal.App.2d 335 [306 P.2d 960]); and liability to plaintiffs herein can be imposed on respondents only if they agreed to take over Foster's duty to inspect for mechanical defects or to maintain its equipment in safe mechanical condition. (*Barbaria* v. *Independent Elevator Co.,* 139 Cal.App.2d 474 [293 P.2d 855].) They did not so agree. Nor does the fact that respondents reserved the right to inspect, made a superficial check of some of the equipment to determine its condition, and suggested changes, in the absence of contract provision imposing a duty, vest in them such control over the equipment or its operations as to impose on them any obligation to a third person. (*Bedford* v. *Bechtel Corp.*, 172 Cal.App.2d 401 [342 P.2d 495]; *McDonald* v. *Shell Oil Co.*, 44 Cal.2d 785 [285 P.2d 902]; *Sabin* v. *Union Oil Co.,* 150 Cal.App.2d 606 [310 P.2d 685].) ▉▉▉ Moreover, the inspections were conducted primarily for respondents' own

underwriting purposes; constituted an entirely gratuitous and incidental service to the policyholder; were limited in scope to only superficial external checks, and were not regular or periodic. Thus, instructions given to the jury differentiating between the privilege granted under the right to inspect, and a legal obligation imposed by a duty to do so, were entirely proper.

 Appellants assign as error reference by counsel in final argument to certain evidence relative to the inability of respondents to compete in the insurance industry if they were required to maintain their policyholders' equipment. In the one instance, the question was asked and answered and no objection was interposed; in the other, objection was sustained but no admonition was requested and counsel did not further pursue the point in argument.

 Appellants proffered an instruction entitled, "Negligence in a Voluntary Service," numbered BAJI 101G, which was refused; however, in their argument that it should have been given they appear to concede that other instructions adequately covered the subject. It contained the statement that a person venturing a service, purely as a gift, as an act of kindness or without expectation of compensation, assumes a duty of exercising ordinary care. Such instruction clearly would not apply to the within facts, for the evidence fails to show any service ventured to Foster or plaintiffs; at most it shows two limited superficial inspections for general appearance and housekeeping, made eight months before the accident, for respondents' own purpose, upon which Foster at no time relied. This is not the type of service contemplated by the instruction. Moreover, in light of section 2850, Labor Code, imposing a duty of "at least slight care and diligence" in undertaking a service for another without consideration, there may be some doubt that the instruction imposing the duty of exercising ordinary care is a correct statement of the law, as it relates to the instant facts. (*Higgins* v. *Security Trust & Sav. Bank,* 203 Cal. 398 [264 P. 744].)

Nor does the general law of negligence impose any duty on the part of respondents to inspect, as urged by appellants. Cases cited in their argument relate to affirmative acts performed in a negligent manner. The most appellants have ever claimed is that respondents *failed* to make the kind and number of inspections they thought respondents should have made—that is, a regular course of periodic undercarriage inspections for mechanical defects. Further, appellants have

failed to point out any special relationship respondents occupied to them which would impose a duty. They were not manufacturers or suppliers of the bus, or owners or possessors thereof having any management or control over it (*Richardson* v. *Ham*, 44 Cal.2d 772 [285 P.2d 269]; *Wolfmeyer* v. *Otis Elevator Co.* (Mo.) 262 S.W.2d 18), and they assumed no responsibility by contract or otherwise to make inspections for the protection of the owner. (*Anderson* v. *London Guarantee & Acc. Co.*, 295 Pa. 368 [145 A. 431].)

Appellants contend there was an express or implied contract between Foster and respondents requiring the latter to perform undercarriage mechanical inspections for their (appellants') express benefit. There is a complete lack of substantial evidence to support such a conclusion; and the jury was justified in making the implied finding that no contractual duty existed. On this issue, the trial court first instructed the jury, at plaintiffs' request, that in determining whether a contract, express or implied, existed between Foster and respondents, it could consider the respondents' advertising material, statements concerning safety engineering service made by their agents and employees, the fact respondents actually inspected Foster's equipment and may have made suggestions to Foster, the fact respondents had the right to inspect it, and any other evidence bearing upon the intention of the parties from which it may have been inferred respondents made such a contract. Then following this, in various other instructions, the court properly advised the jury of the basic elements of contract law relative to consent, mutuality, acceptance, consideration and interpretation, pursuant to sections 1549, 1550, 1565, 1581, 1585, 1605, 1636, 1645, 1647, and 1648, Civil Code, that it may determine whether a contract in fact existed.

No evidence established any free, mutual or communicated consent on the part of respondents to perform undercarriage mechanical or any inspections for Foster. There was no provision in the insurance policy contract mentioning safety engineering services, none in the agreement between Exchange and the Association; and, there is in the evidence no practice or conduct of repeated regular periodic inspections, as shown in the authorities cited by appellants. Nor is there anything in the policy, or the evidence, from which it may be inferred that there was any meeting of the minds upon any essential feature or element of such a contract urged by appellants. The evidence is wholly lacking in details essential to prove

a contract. (*Ellis* v. *Klaff*, 96 Cal.App.2d 471 [216 P.2d 15];
*K. C. Working Chemical Co.* v. *Eureka-Sec. F & M. Ins. Co.*,
82 Cal.App.2d 120 [185 P.2d 832].) No proof established
definite or certain terms in the precise performance which
would be required to perform undercarriage mechanical or
other inspections, anything to show the scope or character of
the inspection, the frequency of inspections, the manner in
which they were to be made, et cetera. Factually, *Johnson* v.
*Holmes Tuttle Lincoln-Mercury, Inc.*, 160 Cal.App.2d 290
[325 P.2d 193], and *Valdez* v. *Taylor Auto. Co.*, 129 Cal.App.
2d 810 [278 P.2d 91], cited by appellants, are not similar to
the instant case, for therein the trier of fact found the terms
to be definite and certain; in the evidence at bar no such
finding could be sustained.

The court properly instructed the jury on the elements of
consideration. The entire safety engineering program was
free and gratuitous, it was not mentioned in the policy, and
not all subscribers took part in or advantage of the program.
And any element of promissory estoppel is lacking, for the
evidence shows that at no time did Foster rely upon any
inspection made by respondents or that they would even make
an inspection.

While respondents' advertising is extravagant relative to
the radar-equipped road patrol service of the safety engineer-
ing program, there is nothing in it which would imply that
respondents would, or intended to, perform undercarriage
mechanical inspections for the insured. But whatever may
be said of respondents' advertising material, there is no evi-
dence Foster or anyone connected therewith, relied upon it
or saw it or knew of it. Mrs. Kennington, upon whose testi-
mony appellants base such an argument, had no connection
with Foster; and in view of various parts of her testimony and
Charles Foster's denial he ever told her anything about re-
spondents' equipment inspections, the jury obviously rejected
her story. Rather extensive advertising relative to inspections
in *Hartford Steam Boiler Inspection & Ins. Co.* v. *Pabst
Brewing Co.*, 201 F. 617 [120 C.C.A. 45, Ann.Cas. 1915A
637], did not impose additional duties or liability upon the
insurer, or extend the obligation and duty spelled out in the
contract in *Otis Elevator Co.* v. *Embert*, 198 Md. 585 [84 A.2d
876], even though advertising copy was printed on the cover
of defendant's maintenance contract.

Having concluded that the evidence does not support any
contract, express or implied, between respondents and Foster

for undercarriage mechanical or other inspection, we deem appellants' claim that such a contract was entered into for their express benefit to merit little discussion. ▮▮▮ To be enforceable by him, a contract must be "made expressly for the benefit of a third person" (Civ. Code, § 1559); he may not enforce a contract which is merely of incidental benefit to him. (*Wilson* v. *Shea,* 29 Cal.App. 788 [157 P. 543]; *Holmes* v. *Columbia Pictures Corp.* (D.C.) 109 F.Supp. 327.) Inasmuch as the evidence shows that respondents' primary purpose in inspecting Foster equipment was for the convenience of their own underwriting department and there was no intent on the part of respondents or Foster to have the benefit of any such inspection inure to plaintiffs, any benefit they may have received therefrom, would be entirely incidental—they cannot claim any duty was owed to them. (*Perrine* v. *Pacific Gas & Elec. Co.,* 186 Cal.App.2d 442 [9 Cal.Rptr. 45].)

The trial court instructed the jury on four elements on which it must find for plaintiffs' recovery on any contractual grounds. The instruction is lengthy, but in pertinent part reads: "It was the duty of Foster Transportation Company Incorporated to exercise ordinary care to provide equipment which was reasonably safe for the use of its passengers. This included the duty to make reasonable undercarriage inspections to discover defects in brakes, drive shafts, brake airlines, drive shaft safety hangers and any other part of the undercarriage which would render such equipment dangerous to life, limb or property. Plaintiffs claim that defendants Truck Insurance Exchange and Truck Underwriters Association, a corporation, have by contract, express or implied, with Foster Transportation Company Incorporated assumed the duty to perform such undercarriage inspection for the benefit of third parties who might use such equipment, to the full extent that such duty was imposed by law upon the Foster Transportation Company Incorporated and to report to the latter any dangerous or defective condition disclosed by such inspection. Before you may find defendants Truck Insurance Exchange and Truck Underwriters Association, a corporation, liable in this case, you must find all of the following facts to be true: 1. That the defendants Truck Insurance Exchange and Truck Underwriters Association, a corporation, by contract, express or implied, assumed the duty to make reasonable undercarriage inspections of the equipment of Foster Transportation Company Incorporated to discover defects in brakes, drive shafts, brake air lines, drive shaft safety hangers and any other part

of the undercarriage which would render such equipment dangerous to life, limb or property *to the full extent that such duty was imposed by law upon the Foster Transportation Company Incorporated* and to report any such defects found to the latter.'' (Emphasis added.) Appellants, among other things, complain of the italicized language above in that it connotes that for them to recover, the jury must find respondents contracted to inspect Foster's equipment as often as Foster should have inspected it, ''perhaps even once or twice a day.'' Earlier in the instruction, the court described the duty imposed by law on Foster which included ''reasonable undercarriage inspections''; there is nothing in this which implies that they must be made as often as ''once or twice a day.'' Inasmuch as this instruction related to contractual liability, the court, and properly so, used this method of describing the scope of the duty and other elements of acceptable performance thereof from which the jury could determine whether there was a meeting of the minds. Rather than being a formula instruction, it appears to be of the ''Issues to be Determined'' type such as found in BAJI. Moreover, this instruction was the product of the joint efforts of Court and counsel in chambers.

 Appellants' contention that Truck Insurance Association was an agent of Foster is without merit. Factually, Foster had no right to control the conduct of Truck Insurance. Legally, the relationships of an inter-insurance exchange, its attorney-in-fact and the policyholders are defined by the Insurance Code (§§ 1300-1540); and under *Rice* v. *Taylor,* 220 Cal. 629 [32 P.2d 381], an insurer cannot be the agent of its policyholder.

Evidence relative to the payment of a membership fee by Foster, and the testimony of the witness Adee concerning his activities as a safety engineer for respondents in 1952, were properly excluded; and in any event were trivial matters in light of the mass of evidence received on the issues at bar.

Having concluded that there is no substantial evidence, and no support in the law for the imposition of a duty on respondents to conduct undercarriage mechanical or any inspections of Foster's equipment, we deem it unnecessary to discuss the subject of breach of duty or proximate cause.

Appellants Smith, in addition, advance the position that ''certain special facts'' in the relationship between respondents and Smith warrant a finding that Smith was one for whose benefit respondents undertook the obligation of ''reason-

able careful inspections of bus No. 49." This, of course, is necessarily predicated upon a finding that respondents undertook such an obligation; the evidence does not support such an inference. They also argue that there was a direct representation by respondents to Smith that the safety engineering program was for his direct benefit, and that he was intentionally encouraged by respondents to believe that it was an *effective* safety program.

Viewing the evidence, resolving all conflicts, and indulging in all reasonable inferences most favorable to the respondents, we find no proof of appellants' factual contentions. Gregory at no time spoke of equipment inspections to Foster's drivers; at the safety meeting on February 4, 1957, the drivers were present but Gregory did not mention equipment checks or inspections of Foster equipment. Relative to the "safety program," Gregory at that time explained about the radar cars and road patrol and told the drivers they were very efficient in checking speed violations, et cetera, for the express purpose of impressing upon them they would be under observation, that they would be more careful; but Gregory's explanation of the road patrol service and other safety operations was entirely unrelated to equipment inspections. The proof does not show that Gregory had ever seen bus 49, or inspected or decalled it—in fact he was certain the "T" decals were placed on it by someone at Foster, since bus 49 was not listed as any piece of equipment inspected or decalled by him. Foster drivers produced by appellants testified they saw only Chuck Foster or Foster mechanics under the buses and relied on no one but Foster to inspect the undercarriages of buses; none could recall having ever seen any literature relative to respondents' inspection of Foster vehicles.

The trial court, after submitting to the jury the issue whether a contract existed between respondents and Foster, then properly submitted the question whether "the defendants (respondents) . . . and the Foster Transportation Inc. each intended by such contract that the inspections agreed upon to be performed would be expressly for the benefit of those persons who would in the ordinary course use or ride in such equipment. . . ." The evidence does not support an affirmative finding on either of these issues, and it is apparent from the jury's verdict. that it either rejected the "certain special facts" as without weight in the evidence or as not credible, or found it unnecessary to consider them, having found no contract to exist between respondents and Foster.

142

■■■■ The judgments in favor of Truck Insurance Exchange and Truck Underwriters Association are affirmed.

JUDGMENTS AS TO THE CITY OF LOS ANGELES

Judgments in favor of the city were entered on jury verdicts. The factual situation is simple. After the mechanical failures occurred, the bus, without brakes, ran downgrade from the crest of the hill on Bohlig Road, a city street which terminated at Highbury Avenue close to a ravine; instead of turning into Highbury, the bus continued onto a pedestrian bridge, which crossed the ravine, and plunged 35 feet below. Plaintiffs claimed that Bohlig Road constituted a dangerous and defective condition—because there was no warning sign that it terminated at the approach of the ravine and continued on Highbury, and because of an optical illusion, created by the contour of the street and the terrain, that Bohlig Road continued across the ravine. They argue that after the mechanical failure at the crest of the hill, the driver did not curb or attempt to stop the bus, but decided to go straight ahead, believing Bohlig Road continued across the ravine because the appearance of the street and the absence of a sign concealed from him that Bohlig terminated east of Highbury Avenue. Appellants make no claim the evidence is insufficient to support the verdict, which included an implied finding that the street did not constitute a dangerous or defective condition; they complain only of certain instructions.

The first instruction challenged reads as follows: "Before you may find the defendant City of Los Angeles liable, you must find that a dangerous and defective condition of public property, to wit, the intersection of Bohlig Road and Highbury Avenue, existed as of September 30, 1957, and that said dangerous and defective condition of public property consisted of a trap for the driver of the bus in question by which at the time of the happening of the accident in question said driver was led or induced by reason of the appearance of the streets in question to believe that Bohlig Road continued east of its intersection with Highbury Avenue; you must further find that a person exercising ordinary care for his own safety would reasonably be led to believe that Bohlig Road continued beyond and east of its intersection with Highbury Avenue; you must further find that the defendant City of Los Angeles had notice or knowledge of such dangerous and defective condition, if any; you must further find that defendant City of Los Angeles, after notice, had an adequate opportunity to correct such dangerous and defective condition, if any, prior

to September 30, 1957; you must further find that after defendant City of Los Angeles had notice or knowledge of such dangerous and defective condition it failed to take such action as might be reasonably necessary to protect the public against such condition; and you must further find from the foregoing that as a proximate result thereof plaintiffs sustained injuries or damages.'' ▮▮▮▮ Appellants claim it was error to require the jury to find the existence of a ''trap''; and that the instruction did not include the element of imminent peril, failed to refer to the absence of any warning sign, and constituted a ''formula.''

While section 53051, Government Code, makes no mention of a ''trap,'' the instruction that the dangerous or defective condition of the street must consist of a trap is not error under the evidence in this case, because the plaintiffs' claim that Bohlig Road constituted a dangerous and defective condition was predicated entirely upon their sole contention that the true nature of the street was concealed from the driver by an optical illusion and by the absence of a warning sign (A.O.B., pp. 10, 11); and under the evidence a finding of a dangerous or defective condition could be sustained only on that ground. ▮▮▮▮ Pitfalls and traps are clearly conditions within the purview of the Public Liability Act (*Castro* v. *Sutter Creek Union High Sch. Dist.*, 25 Cal.App.2d 372 [77 P.2d 509]); and ''Elements essential to a recovery under this statute [Gov. Code, § 53051] include proof that a dangerous condition existed. . . .'' (*Barrett* v. *City of Claremont*, 41 Cal.2d 70, 72 [256 P.2d 977].) ▮▮▮▮ The alleged concealed condition, if true, could constitute nothing less than a pitfall or trap—'' 'a danger which a person who does not know the premises could not avoid by reasonable care and skill.' '' (*McHenry* v. *Howells*, 201 Ore. 697 [272 P.2d 210, 213].)

Nor is there error in the court's failure to include in the instruction a statement that the driver, due to his imminent peril, may have been distracted from making full and complete observations relative to the termination of Bohlig Road. Smith, the driver, died as a result of the injuries sustained in the accident; and the court had previously instructed the jury on due care, that Smith was not guilty of contributory negligence, and that it is presumed Smith in his conduct was exercising due care; it gave a specific instruction on conduct in imminent peril; and admonished the jury that it was bound to consider all of the instructions, as a whole. There is nothing misleading in the instruction (*Amidon* v. *Herbert*, 93 Cal.App.

2d 225 [208 P.2d 733]; *Martens* v. *Redi-Spuds, Inc.*, 113 Cal. App.2d 10 [247 P.2d 605]; *Douglas* v. *Southern Pac. Co.*, 203 Cal. 390 [264 P. 237]); and "imminent peril" was properly covered by other instructions.

While the instruction failed to specify that the city did not remedy the condition by placing a warning sign—that Bohlig Road terminated, narrowed into a pedestrian bridge and ran into a ravine—the omitted reference is not error inasmuch as the absence of a warning sign is only one element of the concealment or trap asserted by plaintiffs and upon which the jury was adequately instructed. Their only claim has been that the city maintained a dangerous and defective condition consisting of an optical illusion and nothing to warn the driver that the illusion was not real, which constituted a concealment which misled him. The failure to warn was part and parcel of the trap, without which, under the evidence herein, the city could not be liable. (*Perry* v. *City of Santa Monica*, 130 Cal. App.2d 370 [279 P.2d 92].) Moreover, this was adequately covered in the instruction which specifically states that in order to find the city liable, the jury must find, among other things, that after the city had notice of such defective and dangerous condition it failed to take such action as might reasonably be necessary to protect the public against such condition. Had appellants truly believed this instruction to be defective, they should have sought to remedy it on the trial level by requesting one of their own including specific reference to the absence of a warning sign.

Prior to giving this instruction, the court instructed the jury on the abstract principles of municipal liability in the language of section 53051, Government Code—that a city is liable for injuries resulting from the dangerous or defective condition of its public streets if it had knowledge or notice thereof and for a reasonable time thereafter failed to remedy the condition or take action reasonably necessary to protect the public against the condition. However, the challenged instruction applied those abstract statutory requirements under the Public Liability Act, to the facts at bar (*Elsey* v. *Domecq*, 114 Cal.App. 42 [299 P. 794]; *Duff* v. *Schaefer Ambulance Service, Inc.*, 132 Cal.App.2d 655 [283 P.2d 91]) in a manner more readily understood by the layman, to which the city was entitled. (*Gilbert* v. *Pessin Grocery Co.*, 132 Cal.App.2d 212 [282 P.2d 148].) It falls short of constituting the formula urged by appellants for it did not direct the jury to find on any factual situation one way or the other—only informed

it what must be found in order to bring the case within the requirements of the Public Liability Act. In the light of all other instructions, it is neither misleading nor invalid, and has none of the faults of a formula instruction. If it operates to direct a verdict against the plaintiffs it does so only because of the lack of evidence in the record to sustain their contention.

In their second assignment of error, appellants argue that the instruction informing the jury that it may consider the "fact of prior knowledge on the part of the bus driver in determining whether he was misled as to whether Bohlig Road terminated at Highbury Avenue" (if it should find such a fact), connoted that plaintiffs had to prove the driver was misled, which is not a part of section 53051, Government Code. This was proper inasmuch as plaintiffs predicated the city's liability specifically on the fact that Smith was "led," by the "optical illusion" and the absence of warning, to believe that Bohlig Road continued through and did not terminate east of Highbury Avenue. (A.O.B., pp. 10-11.) Obviously under their evidence, if Smith was not misled there could have been no dangerous or defective condition which the plaintiffs claimed was the proximate cause of the accident, and their case against the city fails. Prior knowledge, if any, on the part of the bus driver of the condition, was clearly material in determining if he was misled; if he knew from previous trips that Bohlig Road did not continue across the pedestrian bridge, he could hardly have been misled. And the evidence supports such an instruction for it shows he had driven over this route many times prior to the accident. The instruction covered plaintiffs' theory of the case against the city, on which both parties are entitled to have the jury instructed. (*Daniels v. City & County of San Francisco,* 40 Cal.2d 614 [255 P.2d 785].)

Appellants contend it was error to instruct that "a city may, but is not required by law, to improve or make passable any portion of the street. It may, if it wishes, improve certain streets and leave others unimproved . . .," because it infers that even though there may be a defective or dangerous condition the city is not required "to improve or make passable any portion of the street." No such inference is reasonable in light of the two instructions hereinabove discussed—the one drafted in the language of section 53051, Government Code, and the other applying the statutory requirements to the evidence in this case. It is clear therefrom that a

defective or dangerous condition *being absent,* the city is under no duty to improve or make passable any portion of the street; and it is the law that "A city is under no obligation to improve its streets but is bound to keep them all in a reasonable condition, *subject to the conditions stated in the statute.* [Gov. Code, § 53051.]" (Emphasis added.) (*McLaughlin* v. *City of Los Angeles,* 60 Cal.App.2d 241, 243 [140 P.2d 416].)

The instruction: "If you find that the bus involved herein was out of control at the approximate crest of the hill, and that the driver had no alternative but to continue as he did, these circumstances constituted an unusual and extraordinary occurrence which would impose no duty on the part of defendant City of Los Angeles to anticipate or guard against, and, under such circumstances, such defendant may not be held liable," properly stated the law and is not a formula instruction. It was predicated on the initial finding that the bus was out of control at the crest of the hill; if the jury did not so find, the instruction was not applicable. If the jury found that the bus was out of control, it was then properly instructed on the law that a city, in the construction and maintenance of its streets, is liable only for injuries resulting from accidents happening in the ordinary, and customary use of such streets, not in the unusual or extraordinary use (*Loewen* v. *City of Burbank,* 124 Cal.App.2d 551 [269 P.2d 121]; *Beeson* v. *City of Los Angeles,* 115 Cal.App. 122 [300 P. 993]), by, for instance, a vehicle out of control. While a municipality is liable for injuries resulting from a defective or dangerous condition of its streets, suffered in the ordinary, usual and customary use thereof, it is not required to guard against or contemplate the unusual situation; and, as pointed out by respondent, the following out-of-state cases hold that use by a vehicle out of control, unmanageable, or defective (without brakes or with broken steering gear) constitutes such an unusual or extraordinary one. (*Dowell* v. *City of Hannibal,* 357 Mo. 525 [210 S.W.2d 4]; *Kimball* v. *City of Sioux Falls,* 71 S.D. 35 [20 N.W.2d 873]; *Swain* v. *City of Spokane,* 94 Wash. 616 [162 P. 991, L.R.A. 1917D, 754].)

Inasmuch as there was no issue relative to the plaintiffs' conduct and the court specifically instructed the jury that the driver was not contributorily negligent and there could be no issue of any negligence on his part, we find no error in the court's failure to instruct—"to forget a known danger is

not negligent unless such forgetfulness shows a want of ordinary care. . . ." Such an instruction was inapplicable, and was properly refused. (*Ackles* v. *Lane*, 140 Cal.App. 188 [35 P.2d 200].)

Appellants' contention that it was error to refuse an instruction that a dangerous or defective condition means a condition of the streets in question that would have caused them to be not reasonably safe for persons who, with ordinary care for their own safety, were using them for the purposes intended or as permitted by the city, is accompanied by no argument or citation of authority. The record discloses, however, that the principles stated in the proffered instruction were covered by the court in other instructions given to the jury.

The judgments in favor of the City of Los Angeles are affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied August 23, 1962, and appellants' petition for a hearing by the Supreme Court was denied September 26, 1962.